# Wytheville

PAUL CREASY v. COMMONWEALTH OF VIRGINIA.

June 11, 1936.

Present, All the Justices.

The opinion states the case.

*Paul H. Coleman,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Special Assistant,* for the Commonwealth.

CHINN, J.,* delivered the opinion of the court.

Paul Creasy was convicted in the Corporation Court of the city of Lynchburg of robbery from the person of one S. J. Mallan and sentenced to eight years confinement in the penitentiary.

The only error assigned is the refusal of the trial court to sustain the motion of the accused to set aside the verdict of the jury on the ground that it is contrary to the law and the evidence.

The accused, a young man twenty-one years of age, had previously borne a good reputation as to character and industry, though he had a weakness for intoxicating liquor and had once been arrested for drunkenness.

On the afternoon of October 10, 1934, he was on his way home from the factory at which he worked, which was by way of the railway tracks, when he met up with Ira Solomon, Howard Stanley, John Baldwin, and other parties, who stopped Creasy and gave him a drink of whiskey. Baldwin and Stanley were both young men of about the same age as the accused and he had known them for quite a while. Solomon, whom Creasy had known for only a few weeks, was considerably older and had been twice to the penitentiary, which was known to the accused. He was also then under conviction for cutting a man's throat, which fact was known to Creasy. All the parties were drinking when Creasy encountered them and he seems to have readily joined in the spirit of the occasion. The drinking continued until their supply of liquor was exhausted, when Stanley Solomon and Bald-

---

*Owing to circumstances beyond our control, it was necessary to re-assign the writing of this opinion. Hence the delay.

win left the rest of the party and went down the railroad track to where a camp car was located on a side-track. Solomon pawned a ring for fifty cents and procured another quart of liquor. When that was gone he told Stanley, Baldwin and the accused to wait for him until he got back. After Solomon left, Stanley and Baldwin went off together and told the accused to wait for Solomon, which he did. When Solomon came back he said to the accused, "Let's go and get us a drink of whiskey," and pulled out a sawed-off shot gun which he was carrying inside his overalls. It had by that time gotten to be night. Solomon and the accused then went down the street where they again encountered Stanley and Baldwin. He pointed the shot gun at them and said, "I am a good notion to shoot both of you, why did you all want to leave?" Baldwin had procured a pint of liquor of which they all took a drink, and Solomon then told them to "Come on." After turning from Campbell avenue into 12th street, a car drew up to the curb and stopped. Solomon, who was walking ahead with the sawed-off shot gun, threw open the door of the car and ordered the occupant, S. J. Mallan, to move over, and at the same time ordered Baldwin and the accused to get in the back seat of the car with him. Mallan moved over to the right front seat, and Stanley took his place under the steering wheel and drove off. The car was driven out of the city to a bootlegging establishment operated by one "Catfish" Woody. Solomon asked "Catfish" if he had any whiskey. "Catfish" told him he had none. From there they drove to another speakeasy operated by one "Crip" Lawhorne. On arriving there Solomon asked Mallan if he had any money. Mallan replied that he had $1.50 and made a move to get the money out of his pocket and give it to them, when Solomon said, "That is all right, we'll get it." He took the money out of Mallan's pocket, got out of the car and went into Lawhorne's place, and in a few minutes came back with a half-gallon of whiskey. Mallan testified that after they left Lawhorne's, someone in the back seat pulled his left

arm around and removed his wrist watch, worth about $10. At that time Solomon, Stanley and Creasy were sitting in the back seat and Baldwin was driving, but Mallan said he did not know which one of the three took his watch. The accused testified that he did not take the watch and did not see it taken, but it seems conceded that Solomon removed the watch. They then drove out on the Richmond highway, where they stopped and took a drink, and Solomon then started driving. He drove around for a while on the outskirts of the city and when he got back on Campbell avenue, Creasy was allowed to take the wheel because, according to Mallan, Solomon was driving "pretty much on both sides of the street." According to Creasy's testimony, which is uncontradicted, he had been trying to induce Solomon to let him drive in order to get back in a more congested and populous part of the city and obtain a better opportunity to escape from the car. Mallan testifies that the men on the back seat then began to talk about holding up a filling station and Creasy drove by the station several times, but said nothing about the proposition and did not stop until he reached a point near Spring Hill Cemetery, when somebody complained of his driving because he had come near having a collision with a street car. Creasy then brought the car to the curb and said, "All right, if you don't like my driving, let someone else drive," and got out of the left-hand side of the car and went home. Some of his companions called to him to come back, but he went on.

The testimony of Mallan, which is uncontradicted and corresponds with that given by Creasy in nearly all respects, is, that from the time the party invaded his car until Creasy began to drive, a short time before he got out, Creasy was sitting on the back seat with two of the others, and during the entire time Creasy did not say a word in regard to what was going on or as to the intentions of the parties, but maintained a stolid silence throughout. According to Mallan's testimony, Creasy said nothing and took no part when Solomon took the $1.50

out of his pocket and removed his wrist watch. Mallan further says that neither by act, word or gesture did Creasy say or do anything to intimidate him, or in any way show any intention to participate in the crime, except by his mere presence.

The real question is, therefore, whether the evidence is sufficient to show that Creasy aided and abetted in the robbery charged against him. The rule as to what constitutes an aider and abettor is well settled in Virginia by numerous cases.

In *Triplett* v. *Commonwealth,* 141 Va. 577, 127 S. E. 486, 489, Chief Justice Campbell said: "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal or party who commits the crime.

"In *Rasnake's Case,* 135 Va. 677, 710, 115 S. E. 543, Sims, P., cites with approval *Kemp's Case,* 80 Va. 443, and *Wooden's Case,* 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032, where it is held that the settled rule is that mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime."

In *Harold* v. *Commonwealth,* 147 Va. 617, 136 S. E. 658, 660, Judge Burks said: "The mere presence of a party when a crime is committed and his consent thereto is no crime, if he was not aiding, abetting, counselling or advising its commission, and was not present for that purpose."

It is testified by Mr. Mallan that Solomon, who carried a sawed-off shot gun, was the leader of the quartet which assaulted him, and he alone, so far as the evidence shows, inspired and actually perpetrated the offense. Solomon's declared purpose, when he set out, was only to get a drink of whiskey, and it seems evident not only from Creasy's testimony but from the facts and circumstances, that he did not then know that Solomon intended to commit robbery in order to obtain money for the purpose. At the same time, he knew Solomon's reputation and record, he saw him take with him a sawed-off shot gun, and voluntarily went with him when he set out on the expedition

to procure the whiskey; and when it had been obtained by the use of the money taken from Mallan, the accused participated in the fruits of the crime by taking a drink with his companions.

The accused claims that he went with Solomon because, when he produced the sawed-off shot gun, knowing his reputation for recklessness and violence, he was afraid to refuse to do what Solomon told him to do, and for that reason got in Mallan's car when Solomon ordered him to do so; that the car was a two-door coach which made it difficult for him to get out with safety until he had an opportunity to drive the car and bring it to a stop at a place he considered safe for that purpose. While this testimony seems credible, and while it appears that the accused committed no overt act in the commission of the offense, and did nothing in the way of aiding, abetting, counselling or advising its commission, we think the question of whether or not the accused shared the criminal intent of Solomon when he took the money from Mallan is a question for the jury and not for the court.

We are of the opinion that the participation of the accused in the affair was due to the fact that he had been drinking all the evening and was doubtless intoxicated, rather than the fact that he had any real criminal motive or intent when he set out with his companions to obtain more whiskey to satisfy their appetites. It is most regrettable, therefore, that we feel impelled to reach the conclusion that the verdict of the jury is conclusive in the case, and that this young man, who had previously borne a good reputation for honesty, should be subjected to the severe penalty imposed upon him, in consequence of his fondness for liquor and his unfortunate encounter with Solomon, rather than for the commission of a criminal offense inspired by vicious motives. A verdict will not be set aside merely because the court might, if on the jury, have rendered a different verdict. The judgment of the lower court will have to be affirmed.

*Affirmed.*