# Richmond

WILMER WHITED V. COMMONWEALTH.

January 10, 1940.

Record No. 2185.

Present, All the Justices.

S. H. Bond, for the plaintiff in error.

Abram P. Staples, Attorney-General, and Joseph L. Kelly, Jr., Assistant Attorney-General, for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

Wilmer Whited was jointly indicted with J. W. Sturgill and Jeff Flanary for the murder of Pete Hamilton. Upon his arraignment, he elected to be tried separately. The jury which tried him found him guilty of murder in the second degree and fixed his punishment at twenty years in the penitentiary.

The record discloses that Whited, Sturgill and Flanary were duly appointed deputy sheriffs under J. E. Quillen, Sheriff of Scott county. On the day of the homicide Whited and Quillen left Scott county on a business trip to Wise county. When they arrived at Fort Blackmore, where they had gone to procure some papers from Sturgill who was a business associate of Quillen, they were informed that Sturgill and another deputy (Flanary) had gone into the mountains in search of operators of an illicit still. They then proceeded to a point in the mountains near the dividing line between the counties of Wise and Scott, where they located the truck of Sturgill. Leaving their car at the point where the truck was located, Whited and Quillen went further into the mountains to locate Sturgill, which they soon did. Upon enquiry, it was ascertained that Sturgill did not have the desired papers. Quillen was informed by Sturgill that two stills had been located and destroyed but that the main still, for which they were searching had not been found. After depositing in the truck some tools

which had been confiscated at one of the stills, they determined to make another search for additional stills. This search proved unsuccessful and upon their return to the Sturgill truck, they found that the tools they had deposited therein had been stolen. While the quartet was at the truck, eight or ten shots were fired in the vicinity of Hamilton's home and the shot or bullets struck the timber near where the defendant was standing. It was inferred that the shots were fired either by Hamilton, who had recently been released from the Federal penitentiary, or his son-in-law, Cloyd Laney, for the purpose of intimidating them and preventing a further search for the illicit still. The officers then, after some parleying, proceeded on another search for the still, and inferentially, in search of the person or persons who had fired the shots. After another unsuccessful search in the mountains, they were proceeding along a rough roadway when they came upon Hamilton, Laney, Mrs. Hamilton, and Mrs. Laney and some children. Hamilton, who was sitting upon a log, was armed with a double-barrelled shotgun, and Laney, standing nearby, was armed with a pistol. In addition to the shot gun, Hamilton was transporting a small quantity of illicit liquor.

There is serious conflict regarding what actually transpired when the parties came in close view of each other. The evidence of Mrs. Hamilton, Mrs. Laney and Cloyd Laney is to the effect that when the officers came into close proximity, Hamilton and Laney began running in an opposite direction, and immediately the officers began shooting at Hamilton and Laney. A number of shots were fired by the officers and Hamilton was wounded and died shortly thereafter. The evidence adduced by the defendant is to the effect that when the officers were discovered by Hamilton and Laney, they were immediately fired upon and in returning the fire of Hamilton and Laney, Hamilton was killed.

The defendant, as a witness in his own behalf, testified that he was not acquainted with either Hamilton or Laney; that he called upon Hamilton to submit to arrest; that he

did not shoot at Hamilton but did fire two shots at Laney, who was shooting at the officers. The jury resolved the conflict in favor of the Commonwealth.

The contention of the Commonwealth that the evidence warranted a verdict of guilty of murder in the second degree, was based upon the presumption that, because the tools stored in the truck of Sturgill had been stolen, Whited, Sturgill and Flanary became infuriated and entered into a conspiracy to kill the thief, and that whether or not defendant fired the shot which killed Hamilton, he was present, aiding and abetting in the commission of the homicide.

In view of the conclusion we have reached, it becomes unnecessary, and, in fact, it would be improper to discuss the assignment of error that the verdict was contrary to the evidence or contrary to the well-established doctrine relating to the status of an aider or abetter.

It is assigned as error that over the objection of the defendant, the court, upon the motion of the Commonwealth, gave to the jury this instruction:

No. 11. "The Court instructs the jury that if they believe from the evidence in this case beyond a reasonable doubt that Wilmer Whited killed Pete Hamilton, or that John W. Sturgill, or Jeff Flanary, killed him, and that Wilmer Whited was present, aiding, abetting, counseling and advising and consenting to the said crime, and that such killing was wilful, deliberate and premeditated, you should find the defendant guilty of murder in the first degree, and fix his punishment by death, or by confinement in the penitentiary for life, or for any term not less than twenty years. If, however, you believe from the evidence that such killing was wilful and deliberate but not premeditated, you should find the defendant guilty of murder in the second degree, and fix his punishment by confinement in the penitentiary for not less than five nor more than twenty years."

The objection that the instruction is erroneous is well founded. The vice in the instruction is that it tells the jury that if Whited killed Hamilton, or was present, aiding and abetting, etc., in the homicide, then he would be guilty

of murder, even though the killing of Hamilton was warranted by law, and in pursuance of defendant's authorized duty as a law-enforcing officer. The instruction is also amenable to the objection that it fails to draw a distinction between concert of action and simultaneous action. Concert of action must be based upon a conspiracy to commit an illegal act, and one who aids and abets in the commission of the crime must share in the criminal intent of the actual perpetrator of the criminal act. To constitute a conspiracy, there must be "a combination or agreement between two or more persons to do an unlawful act." Wharton's Criminal Law (11th Ed.), Vol. II, p. 1740.

The distinction between concert of action and independent, simultaneous action was recognized by the court in instructions A and B given on motion of the defendant, which became the law of the case. Instructions A and B are as follows:

"The Court instructs the jury that if they believe from the evidence that the defendant and Jeff Flanary and J. W. Sturgill were engaged in searching for an illicit still without any intent on their part to commit any crime and while so engaged an affray or difficulty suddenly arose between them and Cloyd Laney and Pete Hamilton in which said affray or difficulty said defendant, Flanary and Sturgill acted independently of each other and in said affray or difficulty someone killed the said Pete Hamilton, no one except the one who fired the shot that killed said Hamilton can be charged with his death, and that unless the jury shall believe beyond all reasonable doubt that the defendant fired the shot that killed the said Pete Hamilton, they should find the defendant not guilty.

"The Court instructs the jury that the defendant, C. W. Whited, Jeff Flanary and J. W. Sturgill were officers and were engaged in a lawful purpose, and that if they believe from the evidence that while they were so engaged there arose a sudden difficulty, affray or combat with Cloyd Laney and Pete Hamilton in which each of said officers acted independently of each other and in which the said Pete Hamil-

ton was killed, by one of said officers or the said Cloyd Laney, only the party that committed the homicide can be charged therewith, and if the jury has a reasonable doubt as to which of said parties killed said Hamilton, the jury must find the defendant not guilty."

■ A further objection to instruction 11 is that it is in conflict with instruction "Q", which reads as follows:

"The Court tells the jury that if they believe from the evidence in this case that at the time and place where the homicide in question was committed Pete Hamilton and Cloyd Laney had in their possession illicit whiskey and at the time and place aforesaid they were transporting said whiskey and that they had in their possession firearms to aid them in said transportation, they were each guilty of a felony, and if the defendant had reasonable grounds to believe and did believe that they were so armed and were transporting illicit whiskey, then he had a right to arrest each of them without a warrant, and if it were necessary to shoot and kill either of them to prevent his escape the defendant had a right to do so, and the jury should find him not guilty."

The giving of instruction 11 in its present form constitutes reversible error.

The Court upon motion of the Commonwealth and over the objection of defendant, gave this instruction:

No. 12. "The Court instructs the jury that if they believe from the evidence in this case beyond a reasonable doubt that the defendant Wilmer Whited shot at the deceased, Pete Hamilton, with deliberation, premeditation and malice aforethought at a time when the said Pete Hamilton was running away from the officers; and if the jury further believe that at the same time at which the defendant, Whited, was firing his pistol at deceased, the other officers present were also shooting at the deceased with deliberation, premeditation and malice aforethought, then it is not material which one of the officers fired the fatal shot, and the jury should find the defendant guilty of murder in the first degree; but if the jury should believe

the above and further believe that the shooting was wilful and deliberate but not premeditated, then they should find the defendant guilty of murder in the second degree."

In this instruction the jury is told that if defendant killed Hamilton while he (Hamilton) was in flight, then he (defendant) is guilty of murder. This may or may not be true. Even though the jury believed from the evidence that Hamilton was attempting to make his escape because of the two felonies he had presumably committed, to-wit, transporting liquor while armed with a deadly weapon and attempting to kill the officers by shooting at them with a deadly weapon, nevertheless, the jury are told in effect that he had a legal right to run away and make his escape and defendant was guilty of murder, even though he was trying to prevent the escape of a felon.

There are other assignments of error which we do not deem it necessary to consider.

For the errors committed in giving erroneous instructions, we are of opinion that the defendant has not had a fair and impartial trial according to law, therefore, the judgment of the lower court will be reversed and the case remanded for a new trial.

*Reversed.*

HOLT, J., dissenting.

To dissent from the conclusions of those whose judgment through long years of association we have learned to respect and to value should cause a searching out of hearts, for pride of opinion is a pit into which many, moved by the best of motives, fall. But if, upon mature consideration, another conclusion seems to be inevitable, then the path is plain.

In order to justify my conclusions, I find it necessary to restate the case as I see it and to copy at a regrettable length much of the evidence, for it is upon the evidence that this case turns.

The plaintiff-in-error, Wilmer Whited, was indicted jointly with J. W. Sturgill and Jeff Flanary by the grand

jury of Wise County. The indictment charged them with having murdered one Pete Hamilton, forty-one years of age. The three accused were deputy sheriffs of Scott county. Whited elected to be tried separately. He was by the jury found guilty of murder in the second degree, and his punishment was fixed at confinement in the penitentiary for a term of twenty years.

The homicide took place November 13, 1936, late in the afternoon, the scene of it proving to be in Wise county and not in Scott, as the deputies had supposed.

Having made a search for illicit stills in the vicinity of Hamilton's house and found one, or the remains of one, Sheriff Quillen and his three deputies returned to the car and truck they had parked in the main road. They testified that while standing there several shots were fired at them from the direction of Hamilton's house, the bullets striking trees nearby.

The three deputies thereupon decided to return to the locality from which they had just come, the sheriff remaining with the car and truck. Sturgill, after testifying to the shooting above mentioned, gave this explanation of their decision to return to the area contiguous to Hamilton's house:

" * * * We decided to go back down in there, decided from the movements of what they was doing that there was a still still in there, and we decided to go back down and hunt for it, and we turned and went back down the road that led into Hamilton's house there, and we run into these fellows and that is where the shooting started."

Flanary's statement was very similar:

"Yes, sir, there was somebody shooting from off the porch down there at Mr. Laney's house. There was some several shots fired there, and I heard some three or four hit the timber there next to us. * * *

"We heard so much shooting we figured they was making liquor in there, and we was going back to look again. We knowed where another still place was up the holler and we figured we would go up there and drop back in there."

It would appear doubtful whether this preliminary incident, testified to by all four of the officers and also by a fifth man, hunting squirrels, who had joined them in the road, had the significance sought to be attached to it by the deputies. Certainly it was a strange performance for Hamilton, an illicit distiller, or any one connected with him, to have indulged in, since his surroundings had just been visited by the officers, who had gone and, presumably, were on their way elsewhere. It does not seem at all probable that, in such circumstances, Hamilton would have done or permitted to be done anything whatever to attract their attention or calculated to cause their return, much less open a long-range fire on them. It was the hunting season, and if any such shots were fired it would seem much more likely that they were of that character.

Furthermore, I am unable to perceive that the theory of the defense, that the shots were aimed at the officers, helps that side of the case. Rather the contrary, since if that were true it raises a strong presumption that when the officers started for the locality from which they thought the shots had come they did so expecting trouble and were not proposing to allow their assailants, whoever they might prove to be, to get the drop on them.

On their return trip the three deputies turned off the main highway into a narrow "haul road," and in rounding a bend they came upon Hamilton, Cloyd Laney, Hamilton's son-in-law, and the wives of the two, Laney's wife holding in her arms her baby ten months old. The group were only about 80 or 90 feet ahead—the defendant estimated it at 75 or 80—the two women and Laney standing in the road and Hamilton being seated on a log close beside the road. They were talking. There was a fice dog with them. Hamilton had a double-barreled shotgun lying on the ground by his side, also a quart whisky bottle about half full. Laney was armed with a revolver.

Concerning the fatal shooting Mrs. Hamilton testified in part as follows:

"Q. When these men came in sight of you what happened?

"A. The dog went to—we saw them coming. I said: 'There is the law,' and the dog flew out at them and went to barking. * * * One of them jerked their gun. I thought he was aiming to kill my dog and I hollered and told him not to kill my dog, he wouldn't bite him."

*　　*　　*　　*　　*　　*　　*

"Q. What did Pete and Cloyd do, or either of them, as the officers came on down approaching them?

"A. They started running.

"Q. Which direction did they start to run?

"A. Went right over the hill.

"Q. That is going down towards the bottom of the hollow?

"A. Yes, sir.

"Q. Are there any bushes or were there any there along the side of the road where they started running?

"A. Yes, sir, plenty of them.

"Q. And what did the officers do when they started running?

"A. Went to shooting at them.

"Q. Who was shooting?

"A. They was all three shooting.

"Q. Was there anything said by the officers or by Pete or Cloyd at that time?

"A. No, sir.

"Q. How many shots were fired, if you know?

"A. Well, I guess from fifteen to eighteen.

"Q. Were they close together?

"A. Yes, sir.

"Q. Did Pete Hamilton have a gun with him?

"A. Yes, sir.

"Q. What kind of a gun?

"A. Double-barrel shotgun.

"Q. Did he shoot that shotgun?

"A. No, sir.

"Q. Are you positive of that?

"A. Certainly.

"Q. Did Cloyd Laney have a gun, if you know?

"A. I never seed Cloyd with no gun. * * *

"Q. Did he do any shooting there?

"A. No, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Your husband was shot, was he?

"A. Yes, sir.

"Q. Where was he hit, Mrs. Hamilton?

"A. In the back of the neck.

"Q. Do you remember what side?

"A. The right side.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Yes, when all the shooting stopped where was Pete?

"A. He was down under the hill.

"Q. Was he dead or alive?

"A. I imagine he was dead.

"Q. What kind of ground was that as you go down where Pete had run, as to being rough and steep or smooth?

"A. Yes, sir, as far as I went it was rough.

"Q. Were you able to get down there to him?

"A. No, sir, I never did get to him.

"Q. Never were able to get down there?

"A. No, sir, I wasn't able.

"Q. How far out did you get?

"A. I got on top of the little knoll where I could see him lying down there. * * *

"Q. When you got out there was anybody down there next to him?

"A. Pauline.

"Q. Pauline.   And where were these three men?

"A. I met them coming back.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did these men say anything to you as they came back to you?

"A. Yes, sir.

"Q. What was said to you?

"A. I asked them did they kill my husband and they said yes. I asked them was they going to help take him in, and they said no, said they would send help back.

"Q. Send help back?

"A. Yes, sir.

"Q. Where did they go then?

"A. They went towards the knob.

"Q. And who was left there when they went towards the knob?

"A. Just me and Pauline.

"Q. Did she have her baby with her?

"A. Yes, sir.

"Q. And where had Cloyd gone?

"A. I don't know. He never came back to us until night.

"Q. He just ran on off?

"A. Yes, sir, ran on off."

Having just stated that she and her mother had accompanied part of the way home two women neighbors who, with their little boys, had been at her father's house, Mrs. Pauline Laney further testified:

"Q. And after the boys started on, what did you and your mother do?

"A. We started back home.

"Q. Was your mother crippled with rheumatism some at that time?

"A. Yes, sir.

"Q. Was she better then and able to walk better than she is now?

"A. Yes, she could walk around some.

"Q. As you were on your way back home did you meet anyone?

"A. Met my father and my husband.

"Q. Where did you meet them with reference to the place where this shooting happened?

"A. Well, we met there where it happened, just stopped and talked a few minutes, spoke a few words.

"Q. Did your father have anything with him there?

"A. Yes, sir.

"Q. What?

"A. He had a bottle with something in it, and a gun.

"Q. What kind of a gun?

"A. Shotgun.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"Q. Did he appear to be drinking at that time, or drunk or anything?

"A. No, sir, I couldn't tell it. He wasn't drunk.

"Q. What about your husband? Did you see him have anything on him?

"A. No, sir, I didn't see anything.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"Q. Did they check up any or increase their speed, or what did they do?

"A. Well, the dog jumped out on them and we hollered for the dog to come back, my mother did, and the dog come back.

"Q. Wait right there. At the time that the dog jumped out at them what did they do, if anything?

"A. Well, I seen one with a pistol. I never seen him jerk it. I don't know whether he had it or just jerked it out.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"Q. Now at that time were the officers stopped or standing still or were they coming?

"A. They were coming on.

"Q. And where was your husband and your father?

"A. They jumped up, my father did, and then they started running, my father and my husband.

"Q. Did your father shoot any towards these officers at that time?

"A. No, sir.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"Q. About how far were these officers away from where you and your mother were standing or the time that your father and *brother* started to run through the bushes?

"A. I don't know, I guess they was about thirty feet, or maybe a little more, maybe not as far.

"Q. Was there anything said at that time by either one of the three officers or by your father or your husband?

"A. No, sir.

\*    \*    \*    \*    \*    \*    \*

"Q. What happened to your father when the officers were shooting at him?

"A. Well, they shot him. He was right smart piece down the hill—about twenty steps, I guess—by a tree, and I seen him grab his head, and I thought he was shot and I looked back to tell my mother and I seen the dog—

"Q. At the time you saw him grab his head where were these officers?

"A. Well, they was running after my father and Cloyd, and—well, they was pretty close.

"Q. They were running after him?

"A. Yes, sir.

"Q. Where were the officers at the time that they first started shooting?

"A. They was in the road.

\*    \*    \*    \*    \*    \*    \*

"Q. Your father and husband and all three of the officers went over this bank before you got to the edge of it?

"A. Yes, sir.

"Q. When you got to the edge of the bank what did you see?

"A. I seen my father lying there. Mr. Whited was right at him, and one officer was on one side and one on the other, and they told me not to come down there.

\*    \*    \*    \*    \*    \*    \*

"Q. When you got down to your father what did you do?

"A. Well, I just knelt down beside him and tried to get him to speak to me, but the last breath was leaving out of him.

\*    \*    \*    \*    \*    \*    \*

"Q. Where was your baby at that time?

"A. Well, Mr. Sturgill had it, and I don't know—

*      *      *      *      *      *      *

"Q. Do you know how he got your baby, or where he got it?

"A. No, sir, I don't ever remember giving it to him.

"Q. What did he do with the baby?

"A. He told me there was my baby, and I told him to set it down and when he set it down it went to crying and I picked it up and * * *

"Q. What did he do then?

"A. Walked off and left."

And the body lay there until midnight.

Cloyd Laney's account of the affair is as follows:

"Q. What happened when the officers turned the corner around that log and came in sight?

"A. Well, when they first come in sight they was coming pretty fast, and one of them, Mr. Whited, had his gun in his hand, the best I remember, and the other two had their hands back towards their guns, and when we saw them come around there we raised up and started off down the hill, me and Pete.

"Q. You were already up, I believe?

"A. Pete was sitting down, though, and he got up.

"Q. What did the dog do there?

"A. The dog run out towards where they was at, and Mrs. Hamilton hollered at the dog.

"Q. Did she say anything about shooting the dog?

"A. I don't remember hearing her say that, for I was starting to run by that time.

"Q. Now about how close were the officers to you and Pete when you started to run?

"A. Well, they was about half way from where the log was to where he was at.

*      *      *      *      *      *      *

"Q. How wide is that little road you all were in?

"A. I don't know. It is wide enough for a car or truck or anything to come down there.

"Q. Just wide enough for one vehicle?

"A. Just about one, yes, that is all.

\* \* \* \* \* \* \*

"Q. Did you and Pete run in the same direction?

"A. About in the same direction, yes.

"Q. Did you start at about the same time or not?

"A. Well, he got up and stepped over the log and started off and then I passed him.

\* \* \* \* \* \* \*

"Q. At the time you and Pete started running what did these three officers do?

"A. They started shooting.

"Q. About how many shots were fired there, Cloyd?

"A. I don't know, fifteen or twenty, I guess; I couldn't hardly tell.

"Q. And you say you never fired a single shot?

"A. No, sir.

"Q. Did you take your gun out of the holster?

"A. No, sir.

"Q. Did you hesitate at all after you started to run?

"A. No, sir, never looked back."

Sturgill told quite a different story:

"Q. Now· at that time where were you with reference to that log that they talked about, that log there in the bend of the road? Where were you with reference to that when Mr. Whited said he saw a woman?

"A. Well, we was—we hadn't come to the log yet.

"Q. You hadn't reached that log?

"A. No, not where they was standing.

"Q. All right.

"A. So we walked on out around, it was a pretty short bend there, and when we turned the bend why I saw Laney standing in the road with his gun in his hand, pistol, holding it *kindly* in that position (indicating), and we walked on,

just kept walking right on towards him, and he raised his gun up and Mr. Whited says, 'Drop that gun and put your hands up,' and about that time why Hamilton just come up—he seemed to be setting below the road, would have been on our left, the way that we was traveling—and about the time he come up the firing started.

"Q. Well now, what do you mean by Hamilton 'coming up'?

"A. He had a gun in his hands that way, and I don't know whether he had been setting on a pole or whether he was hunkered down. Anyway, he raised up; there was a pole right about where he was at.

"Q. What kind of a gun was it?

"A. It was a double-barrel shotgun.

"Q. What kind of a gun was it, or pistol, that Laney had?

"A. It was a pistol, is all I know about it. I didn't have it in my hand or anything.

"Q. Well now, you say Hamilton rose up with that gun and the firing began. Who fired the first shots there?

"A. The shotgun fired first.

"Q. How many times did that shotgun fire?

"A. Well, I am not positive whether he fired over three or not, but I am pretty sure he fired three times. He fired twice when he first raised up.

"Q. Well now what was the first shots that were fired, from what kind of a firearm did that come?

"A. Well, the first shot was a shotgun, and then it just all started just fast like that (Witness snapped fingers.)

      *       *       *       *       *       *       *

"Q. What time did Laney begin to shoot with reference to the time that Hamilton first fired the shotgun?

"A. Pretty well the same time. It was all fast.

      *       *       *       *       *       *       *

"Q. Did you have a pistol?

"A. I had one in my pocket.

"Q. Did you use that pistol any there?

"A. No, sir.

"Q. Did you shoot that pistol at all?

"A. Not there.

\*     \*     \*     \*     \*     \*     \*

"Q. Well now, where did you first—you said you had your pistol in your pocket. Where did you first get it out?

"A. After I had started down over the hill, after I had saw Hamilton was laying down there, I thought Laney might be hid behind something there and start shooting again.

"Q. You didn't get that pistol out at all until after Mr. Hamilton was shot?

"A. No, sir."

The following is Flanary's version:

"Q. Just go ahead and tell now what happened from there on.

"A. Well, we was going on down that road, until we got down pretty close to the old field there, and I just spoke to Mr. Whited and Sturgill, I said, 'Well, we better get off into the hollow,' and about that time Wilmer said, 'Well, there is no use now; yonder is a woman.' So we just walked on the road and when we come around the bend Mr. Laney was standing in the road.

"Q. Now did Laney have anything?

"A. He had a pistol.

"Q. Who else could you see there when you got in sight besides Laney?

"A. Two women.

"Q. And where were the women with reference to Laney?

"A. They was standing just above the road.

"Q. What happened there then?

"A. Well, we walked right on until we got down pretty close on them, and this other man sprung up out about the lower side of the road. He was sitting down or hunkered down in some little sprouts and briers there. He just riz

out of there with a double-barrel shotgun and made one step back in the brush and opened fire on us, and from that why Laney he stepped into the brush and he went to shooting.

"Q. How close was Hamilton—was Hamilton in the road or had he gotten out of the road there when he fired the first shot?

"A. He just stepped back out of the road.

"Q. How far out of the road?

"A. Well, he stepped about one step back out of the road.

"Q. How many shots did Hamilton fire?

"A. He fired four, all I know of. He fired two right—

"Q. The first shots that he fired, how many did he fire?

"A. Two.

"Q. Had anybody fired any shots before Hamilton shot?

"A. No, sir.

"Q. And how about Laney? Did he shoot?

"A. He shot after Hamilton did. Hamilton shot first.

"Q. Had anybody shot before Laney shot?

"A. No, sir, except Hamilton.

"Q. Then what happened when Hamilton and Laney began shooting?

"A. Well, when they began shooting, about the time they began shooting, the dog grabbed me by the leg there.

"Q. Where were you when the dog got you by the leg?

"A. In the road.

"Q. How close to where Hamilton and Laney left the road were you when the dog got hold of you?

"A. Well, I was in ten or fifteen feet of them, I guess.

"Q. Ten or fifteen feet of Hamilton and Laney, you say?

"A. Yes, sir.

"Q. Now you say a dog got you by the leg there?

"A. Yes, sir.

"Q. What did he do to you?

"A. He bit me.

"Q. And what happened then when the dog bit you?

"A. I shot him loose from my leg."

The defendant, Whited, testified concerning the killing as follows:

"Q. Well now, you go ahead and tell your movements from the time you got into the haul road * * * and what happened and everything connected with it.

"A. Well, we just walked on off down the road * * * and on down some little distance, and Mr. Flanary suggested that we drop off to the left, that he knew of an old still furnace down there, and we would go down that way. Well, at that point I looked ahead on out the way we had been traveling and I noticed a lady on the upper side of the road, up on this flat of land there. There was a big log laid across there. I just noticed her from maybe her shoulders up, on the other side of that log on the right of the road. * * *

"Q. Well, what happened when you saw that woman, then what did you all do?

"A. Well, I just made the remark that I didn't think there was any use, that there was a woman and she would report to them, and let's see what she meant, and we walked on around.

"Q. How were you walking, about what kind of a gait were you moving?

"A. Well, we was walking pretty pert, a moderate gait for men to be traveling.

"Q. Tell what happened there then.

"A. Well, we come on out and turned this curve back around, and off down some seventy-five, maybe eighty feet there was a man standing in the road, on the left.

"Q. Did he have anything?

"A. Yes, sir, he had a pistol in his hand.

"Q. Did you know at that time who he was?

"A. No, until they told me. At that point one of the other officers made a remark, said, 'There is Laney now.'

"Q. All right.

"A. So we just kept walking on. So there was a lady, two ladies, standing on the right off up out of the road on this kind of a grassy flat land there. So we just kept mov-

ing on. At a short distance there between where we had come around and this man there was a dog charged us from over where these two women stood, come at us, and I drew my gun to keep the dog off me, but before the dog got to me I had noticed this fellow Laney throwed his gun up and when he done that I called on him, I said, 'Drop your gun,' and at the same point this other man raised from behind him, I dropped at the left into the bushes, * * * and the firing started.

"Q. Now who fired that first shot that was fired there?

"A. Well, I wouldn't want to say which one fired the first shot, but they both commenced firing on us just close to the same time.

"Q. Well now, what I mean, was the first shots that were fired there shot by Laney and Hamilton or by the officers?

"A. One of the two.

"Q. Either Laney or Hamilton?

"A. Yes, sir, I couldn't say whether the pistol or the shotgun, which one fired first, but it was close to the same time.

"Q. I believe you say you didn't get your pistol until the dog was making—

"A. That is what I pulled my gun for, was to keep him off me.

"Q. And about how many shots would you say there right in the beginning by Hamilton and Laney or either of them was fired?

"A. * * * There was some six or seven shots fired there; in other words, they emptied their guns there, the best I remember.

"Q. Had they gotten out of the road there, or were they in the road when they were firing or near the road?

"A. They was backing off, working back off towards the end of this log that lays—working their way back off and turning.

"Q. How close were they together?

"A. Well, they were close together. They got around the end of that log.

"Q. And you say you turned out there before—

"A. Yes, when the firing started I dropped to my left right in through this tree-lap.

"Q. About how close were you to Laney and Hamilton when you dropped off there to your left?

"A. I judge we was from twelve to fourteen feet, maybe sixteen.

"Q. I presume you couldn't very definitely approximate distances on an occasion like that?

"A. No, sir. We was up pretty close to him.

"Q. Did you shoot any, sir?

"A. No, sir, I did not.

"Q. Well, did you shoot there at any time?

"A. Yes, sir.

"Q. Where were you with reference to the road, with reference to where you first shot, if you did shoot, sir?

"A. They worked their way in around the right of this tree-lap that fell there and I went through the lap of that up close to the top of the limbs, briers and bushes, and went through and come around, and they had worked their way around at that point and was close to the butt of this log down there reloading when I come around.

"Q. And did you shoot any there?

"A. Not at that point. I called on them to drop their guns. I said, 'Drop your guns and consider yourselves under arrest.' Well, at that point, they broke, kinda whirled and kept loading and working their way down the hill, and somewhere six to eight feet below that I fired one shot at Laney's legs, and somewhere down maybe twelve to sixteen feet I fired at Laney again.

\*  \*  \*  \*  \*  \*  \*

"Q. About what distance would you say that you were from Laney when you fired those shots?

"A. Well, the first one I fired, I guess close to twenty feet from him, maybe eighteen to twenty feet.

\*  \*  \*  \*  \*  \*  \*

"Q. About what was the rapidity of that shooting?

"A. Well, they was fired pretty rapid right at the start, some several shots fired, then there was a lull and there was some more shots then fired after that. They worked their way on down to this break where it breaks over, close to it, and Mr. Hamilton, the last I seen of him, had his gun broke down across his knee and Laney was on the right, lower down the hill, firing at me over here, as I went from a little —there was three stumps over here—I made my way for them stumps and that space, he was firing at me.

"Q. That was the last you saw of Laney?

"A. That was the last I saw of either one of the men.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Well, when you found out, when the remark was made there that a man had been shot, state whether you went to him.

"A. Yes, sir, we went on down to him.

"Q. What did you find when you got there?

"A. We found Mr. Hamilton there. He was laying with his head down the hill. A good size rock was laying under his shoulders, and his head was hanging over that rock in a bad position.

"Q. Was he dead then?

"A. No, sir, he was still struggling.

"Q. What did you do, if anything, to the body when you found Mr. Hamilton in the position that you say?

"A. I asked Mr. Sturgill and Mr. Flanary, one or the two, to help me move him down and lay him in a more comfortable position.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. About how long did you remain there after you found that Mr. Hamilton was fatally shot and killed?

"A. I judge from five to ten minutes."

Following are a few of the questions asked Whited on cross-examination and his answers to them:

"Q. What did you say to him?

"A. 'Drop your guns and consider yourselves under arrest.'

"Q. 'Drop your gun and consider yourself under arrest.'

"A. Yes, sir.

"Q. Where did you have your gun when you were talking that way to them?

"A. Had it in my hand.

"Q. And you were talking to a man that had already shot at you several times, hadn't they?

"A. Yes, sir.

"Q. And then they were re-loading their gun, re-loading his shotgun to shoot at you again?

"A. Yes, sir.

"Q. And he did shoot at you again, didn't he?

"A. How is that?

"Q. He did shoot at you again, didn't he?

"A. There was more shots fired there.

"Q. Did he point the gun toward you when he was shooting?

"A. I wouldn't want to state which way they was pointing their guns.

"Q. Wouldn't want to state which way they was pointing their guns. Why did you shoot them, if you didn't know which way they were pointing their guns?

"A. Well, I was trying to get them to submit to arrest.

\*      \*      \*      \*      \*      \*      \*

"Q. And you called on him to submit to arrest because he had his gun on you?

"A. Asked him to drop his gun and consider himself under arrest.

"Q. And that is what you were still asking him to do after he had emptied the shotgun and was re-loading, and after the man had been shooting with his pistol you were still calling on him coolly. Where was it you decided you had better shoot some?

"A. I fired one shot when they kept working on and didn't submit to arrest. I fired one shot at that point at Laney; somewhere from six to ten feet below I fired the second shot at them.

\*      \*      \*      \*      \*      \*      \*

"Q. How far was Laney away from you?

"A. Well, the last shot I fired he was some little distance on lower, still working down—

"Q. About how far do you think he was away from you?

"A. Well, I judge it was something like thirty feet, or maybe—

"Q. Thirty feet away?

"A. Yes, sir.

"Q. Well, you are a pretty good shot, aren't you?

"A. No, sir, not so good.

"Q. Not a very good shot?

"A. No, sir.

"Q. Well, did you try to hit him?

"A. Yes, sir, I did.

"Q. How many times did you shoot at him?

"A. I shot two.

"Q. How many times did you shoot at Pete?

"A. I never shot airy one.

"Q. Never shot at him?

"A. No, sir.

"Q. Did anybody shoot at Pete that you know of?

"A. No, sir.

"Q. Pete got hit, didn't he?

"A. Yes, sir, the man was shot."

The Commonwealth introduced W. D. O'Neil, game warden of Wise county. He testified in part:

"Q. On the day after Pete Hamilton was killed, did you accompany me to the scene in order to act as a guide, to show me where it was and how to get there?

"A. Yes, sir.

"Q. While there on that next morning did you make some examinations and observations of the ground and the scene there?

"A. Yes, sir.

*      *      *      *      *      *      *

"Q. Did you make an examination of the timber on the side of the road to see if there were any bullet marks on it?

"A. I did.

"Q. Did you find any?

"A. Yes, sir.

"Q. About how many did you find?

"A. As I recall, there were about three or four marks that I found.

"Q. On which side of the road were those?

"A. On the left side going toward the Hamilton house.

"Q. Is that on the lower or upper side?

"A. The lower side.

"Q. And which direction were those bullets going, if you could tell?

"A. They were going in the direction that the road went, and to the left of the road.

"Q. Going down the hill or up the hill?

"A. Down the hill.

"Q. How could you tell that?

"A. From the marks in the timber.

"Q. Did you find any one of those bullets that had been fired there?

"A. There was a bullet taken out of a log right near the scene, just below where the place was marked where Hamilton had been sitting.

"Q. I show you a bullet and ask you if that was the one that was cut out of the log there that morning?

"A. It is quite evident that is the same bullet.

"Q. Did you make any identification mark on it at that time so you could tell it?

"A. Yes, sir, made a little "X" in the end of it.

"Q. And that is the same one, that has the same mark on it?

"A. Yes, sir.

"Q. What caliber is that, if you know?

"A. I would take it for a .38.

  *   *   *   *   *   *   *

"Q. Did you make any examination of the timber on the upper side of the road for bullet marks?

"A. Yes, sir.

"Q. Did you find any on the upper side of the road?

"A. No, sir, I did not.

"Q. Did you find any sign of bullet marks or shot marks on the lower side of the road that showed the shot to be heading back towards the road?

"A. No, sir, I did not."

Quillen, the sheriff, said:

"Q. When you all got back up to the cars, why you found that the saw and the half bushel and still worm was gone, didn't you?

"A. Yes, they said it was. They looked in the truck and said the stuff was gone.

"Q. And you just figured that some of those moonshiners got it?

"A. I didn't know who had got it or nothing about that.

"Q. Isn't that what you all figured and talked about?

"A. There was some fellows around the car and shot several shots while we was down on the creek. They were shooting around the car."

In this conflict of evidence we apply here the rule elsewhere always applied and accept all credible evidence which tends to support both the verdict and the judgment. Under it self-defense goes out. Moreover, testimony in its support bears upon its face indicia of intrinsic improbabilities. It is not to be supposed that men with their wives and a little baby would precipitate a gun battle with three officers unless their situation was desperate. Hamilton's wife was so crippled by rheumatism that she could not even reach her husband's body. With Hamilton dead, not even one of them offered to stay until aid could be summoned.

Again, had the deputies been facing the rapid and close-range fire of two mountaineers, as the testimony of the three officers sought to make it appear, then Flanary scarcely would have allowed his attention to be diverted from their human assailants to the dog even for an in-

stant; and that it was so diverted is attested by the presence of the dog's dead body on the scene.

Moreover, if we were to concede that Hamilton and Laney had once fired upon them, that situation had certainly ceased when Hamilton was killed, for he was then running down the hill, was shot in the back of the neck and fell forward in the same direction the pursuing officers were moving. Certainly then they were not in danger. Again, there was evidence on trees and brushes that bullets were fired in the direction in which Hamilton was running and there was no evidence of them in the direction from which the officers came, all of which tends to support, if support was necessary, the Commonwealth's evidence. There was no warrant out for Hamilton, and even if it be conceded that he had committed a felony, they did not know it; and had they known it, they would have known that the offense was technical and not serious. He was no public enemy No. 1, and he was not resisting arrest. This was the situation when they came upon him and when, without more ado, they killed him as he fled.

What right did an officer have to kill this suspected moonshiner? Certainly they had no right to kill one suspected of a misdemeanor, though he were attempting to escape. In certain circumstances he may kill one suspected of a felony. "But the slayer in such cases, especially if he be a mere pursuer, must not only show the adequate ground to believe that a felony was actually committed, but that he avowed his object and that the felon refused to submit and that the killing was necessary to make the arrest." 1st Wharton's Criminal Law, Vol. 1, 11th Ed., p. 722.

Upon no class does the duty of keeping within the law rest more heavily than it does upon those charged with its execution. As was said in *Price* v. *Honeycutt* (Oct. 11, 1939), 216 N. C. 270, 4 S. E. (2d) 611, 614, "The law is never more definitely on trial than when it comes in contact with the public in its execution."

In *Hendricks* v. *Commonwealth*, 163 Va. 1102, 178 S. E. 8, we said:

"The law does not clothe an officer with the authority to judge arbitrarily of the necessity of killing a person to secure him, or of killing a person to prevent the rescue of a prisoner. He cannot kill unless there is a necessity for it, and the jury must determine upon the testimony the existence or absence of the necessity. They must judge of the reasonableness of the grounds upon which the officer acted."

The presence of that necessity spoken of in the cases is preeminently a question of fact and therefore a question for the jury.

In that case the conviction of an officer was sustained. He shot and killed a man who was attempting to escape and who was charged with having stolen an automobile. The theft of this automobile, if it was a theft, was a felony and McHough was certainly trying to escape and Hendricks was trying to arrest him.

It is further said that the Commonwealth's case must fall because there is no evidence to show from whose pistol the fatal bullet was fired.

At that time there were present three officers, Whited, Sturgill and Flanary. Sturgill contends that he did not shoot at all. Flanary said that fifteen or twenty shots were fired and the accused contends that when Hamilton and Laney opened fire, he shot at Laney's legs and never at Hamilton. The net result of that evidence is this: Two of these officers opened fire, one of which was the accused.

In these circumstances it is not necessary to show who hit Hamilton. Liability is joint and several whenever there is community of purpose and concert of action. The will to cooperate, like the will to murder, may be born in a moment. Will and intent is of the essence. The time in which they have operated is immaterial. Proof of necessity must in most cases be circumstantial, and it is also true that men generally intend to do those things which they have done.

That there was community of purpose is too plain for argument. They were seeking to apprehend this suspected

moonshiner; likewise we take it that there is ample evidence to show concert of action.

Had Hamilton been pursued by a crowd of private citizens or of officers, shooting indiscriminately, plainly the act of one would have been the act of all.

Suppose that due to bad marksmanship these eighteen or twenty shots had been fired in vain and that these officers had continued the pursuit, had apprehended the fugitive and hung him out of hand, could it be said that there was no concert of action?

Moreover, as indicative of their state of mind, these officers in the progress of their search had procured evidence which was soon afterwards stolen from their automobile and in accordance with their own evidence had several times been shot at during the morning. It is fair to assume that they thought these shots had been fired by the man they were looking for, and that when they came upon Hamilton and his associates, they believed them to be the man or men they were looking for. It was then that they killed him without parley. We are told in this approved instruction when liability is joint and several:

"The court instructs the jury that principals in the first degree in every murder or other crime are those who are the actors or actual perpetrators of the crime—those who are the immediate perpetrators of the act. That principals in the second degree are those who did not with their own hands commit the act, but were present aiding and abetting it. It is not necessary in order to make a person a principal in the second degree that he actually participate in the commission of the crime. The test as to whether or not he is principal in the second degree is, was he encouraging, inciting, or in some manner offering aid or consent to the crime? A person present lending countenance, or otherwise aiding, while another does the act, is principal in the second degree, and liable to the same punishment as if he were principal in the first degree and actually committed the crime." *Rasnake* v. *Commonwealth,* 135 Va. 677, 115 S. E. 543.

In *Serrato* v. *State*, 74 Tex. Cr. 413, 171 S. W. 1133, 1139, the court said:

"It is thus seen that if the crime committed is not in any way connected with the common purpose and design, but is an independent act of one of the parties, although he did it while engaged in the design, the others would not be legally responsible for such independent act, but if the crime was in furtherance of the common purpose and design, and the facts show that it was such an offense as might have been and should have been contemplated by the parties would be the result of the execution of the common design, and it was so executed, then all engaged in the unlawful purpose are equally guilty of the offense, * * * ."

In *People* v. *Bogue*, 319 Ill. 294, 149 N. E. 750, 751, the court said:

"If the defendants had a common design to commit the crime the act of one was the act of all and all would be equally guilty."

*Hardy* v. *State*, 89 Tex. Cr. 469, 231 S. W. 1097, 1098, furnishes a concrete application of the principle. There the Texas Court of Criminal Appeals, by Hawkins, J., said:

"Appellant and his companions were acting together, and it was immaterial which one committed the various assaults on the different Mexicans. It was a joint enterprise, in which all were participating.

"Hernandez was permitted to testify over appellant's objection that one of the negroes hit him in the head with a track wrench, which still had blood on it at the time of the trial, the objection being that it had not been shown that appellant struck him. It was immaterial whether it was appellant or some of his confederates who struck the blow. The act of one was the act of all, and properly provable against whichever one was on trial."

Sheriffs, policemen and other officers of like character properly are authorized to go armed, but the obligation to refrain from using their weapons to take human life, except in extreme crises where no alternative reasonably is pos-

sible, is one concerning which, in my judgment, the decisions of no court should leave room for doubt.

It is not necessary to discuss the instructions in detail. The principles with which they deal have already been considered and in them, as I see it, there is no reversible error. A painstaking examination of the evidence shows that which was tendered on behalf of the Commonwealth is ample to support the verdict and more. That tendered on behalf of the accused did not convince the jury and is not convincing. During the progress of a protracted trial, conducted by able counsel, it would be quite unusual if some errors did not creep in, for, as it has been well said, there is no such thing as a perfect trial. A man is entitled to one fair trial and to no more. Where it appears that a right conclusion has been reached, the verdict should stand. This case, upon the instructions, has been fairly submitted, and in them, as I see it, no reversible error is committed. If the law has been fairly stated, a defendant can not complain because, in some instances, it has been stated more favorably for him than it should have been. If there be such a conflict, it is harmless error. We are safe in assuming that a jury of Wise county would not readily find one of its officers guilty of something done in the proper discharge of his official duties.

I am of opinion that the judgment complained of should be affirmed.