# Richmond

JUNIOR STONE V. COMMONWEALTH OF VIRGINIA.

November 25, 1940.

Record No. 2311.

Present, All the Justices.

The opinion states the case.

*A. N. Kilgore* and *George L. Taylor*, for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This writ of error brings under review a judgment of the Circuit Court of Wise county, sentencing Junior Stone to confinement in the penitentiary for a term of one year, in accordance with the verdict of a jury finding him guilty of grand larceny.

The indictment upon which the accused was tried and convicted charged him and one Gilmer Shupe, jointly, with the felonious taking from the person of one A. P. Green, the sum of $26.

The indictment contained two counts, reading as follows:

"The Grand Jurors of the Commonwealth of Virginia, in and for the body of said County of Wise and now attending said Court at its July term, in the year, 1939, upon their

oaths, do present that Junior Stone and Gilmer Shupe, on the .... day of June, 1939, within one year next prior to the finding of this indictment, in the said County of Wise, in and upon one A. P. Greene, feloniously did make an assault, and him, the said A. P. Greene, feloniously did strike, beat and assault, and him the said A. P. Greene, in bodily fear feloniously did put, and $26.00, of the goods and chattels, money and property of the said A. P. Greene, from the person, and against the will of the said A. P. Greene, then and there, to-wit:

"On the day and year aforesaid, in the county aforesaid, feloniously and violently did take, steal and carry away, against the Peace and Dignity of the Commonwealth.

### "Second Count.

"And the Grand Jurors aforesaid upon their oaths aforesaid do further present that the said Junior Stone and Gilmer Shupe, on the .... day of June, 1939, in the said County of Wise, did unlawfully and feloniously, take, steal and carry away from the person of one A. P. Greene, $26.00 in lawful currency of the United States of the value of $26.00, of the property of A. P. Greene.

"Against the peace and dignity of the Commonwealth of Virginia."

Upon their arraignment, accused elected to be tried separately, and the jury found Stone guilty under the second count of the indictment.

It is assigned as error that the trial court refused to set aside the verdict of the jury because it was contrary to the law and the evidence.

The accused, a young man twenty-two years of age, is the son of A. E. Stone, store manager of the Peerless Coal Company, and bore a good reputation as to character, and so far as the record shows, was a law-abiding citizen. A. P. Green, the alleged victim of the robbery, was a neighbor and acquaintance of the Stone family, and lived in Glamorgan, Virginia.

On Saturday, June 24, 1939, Stone and Gilmer Shupe visited the town of Norton and spent the afternoon sauntering around the streets, visiting the movies, and, together with two other young men, consuming a pint of whiskey purchased from the A. B. C. store in Norton. Shupe had with him $2.25, and Stone had $5.

A. P. Green and his eighteen year old brother were also visitors to Norton on that day and spent the afternoon sauntering around the town, partaking of refreshments in a restaurant, visiting the movies and drinking whiskey. Green, who had primarily visited Norton to bargain for a second hand automobile, had on his person the sum of $31. Sometime in the evening, Stone, Shupe and the two Greens met in a restaurant and in response to the request of Stone and Shupe, who said they were "broke", Green purchased a pint of whiskey and gave it to Stone.

It is not shown how much liquor Green had consumed during the day, but it is conceded that he was "somewhat intoxicated", as were Stone and Shupe.

Someone suggested that all of them go to a dance at the nearby C. C. C. camp. Green's brother decided to go home, and in the presence of Shupe and Stone, Green gave him one dollar from a roll of bills. At approximately nine o'clock at night, Stone, Shupe and Green left for the dance at the camp.

Green's account of the alleged robbery is as follows:

"Q. Tell what happened.

"A. After we went over there to the railroad track, I got a shove in the back and fell and caught on this hand and leg (right hand and leg).

"Q. Who was behind?

"A. Gilmer Shupe and Junior Stone was in front.

"Q. What happened then?

"A. I had the money in this pocket and my hand in the pocket when I fell; my hand come out and someone struck me there (witness indicates right hand) and I put my hand up and dropped the pocket book, and Shupe picked the pocket book up, and Junior looked back and they went on,

and about that time a negro man stepped up and said, 'What happened?' and I said, 'These boys got my money.'"

The further evidence of Green is to the effect that from the scene of the alleged robbery he went to the "shack" of a negro night-watchman in the employ of the railway company and spent the night; that he did not notify the police that he had been robbed; that Sunday morning he went to the Virginia Hotel and saw Stone and asked him "something about the money", and that Stone said he "never got the money"; that he stayed in the hotel room of a man named Gilliam until evening, when he went to a dance hall, and from there to the home of his grandfather, where he spent the night; that during the day he drank some beer; that on the following Monday, a warrant of arrest was issued for Shupe and Stone.

The accused testified, in substance, that three months prior to the alleged offense, he was employed as a truck driver in the city of Staunton; that he gave up this job and returned to Wise county; that for three months he was unemployed, but that he was insured under the Social Security Act and received the sum of $15 per week as unemployment insurance; that from time to time his father gave him money; that on the day of the alleged robbery he accompanied Gilmer Shupe to Norton, Virginia; that he had with him the sum of $5; that during his stay in Norton he visited a moving picture theater, ate lunch at a restaurant, and with three others, contributed to the purchase of a pint of whiskey costing sixty-five cents, a portion of which he consumed; that late in the evening, he and Shupe met Green; that Green had half a pint of whiskey which the three consumed; that Green purchased a pint of whiskey, and after taking a drink, gave the bottle to him; that he did not recall telling Green he was "broke", and if he did so, he was merely joking; that he saw Green with some money; that, in company with Green and Shupe, he proceeded to the dance at the C. C. C. camp; that on the way, he met a negro man named Goode, who had worked for his father and that they proceeded ahead of Green and Shupe;

that he went to the dance and stayed at the camp until approximately twelve o'clock, when he and Shupe went to the hotel; that Shupe only stayed at the hotel a short time; that he paid fifty cents for a room; that he did not see Shupe again until the next day; that he did not know of the alleged robbery until informed by Green; that when Green accused him of getting his money, he denied the charge, called him a "damn liar" and was prevented from striking Green by Rife, the hotel manager (in this he was corroborated by Rife); that he did not in any manner engage in the alleged robbery, nor did he receive any part of the money belonging to Green.

Gilmer Shupe, introduced as a witness for the accused, testified that while on the way to the dance, Green was quite drunk; that Stone and Goode walked ahead of Green; that he also was ahead of Green when the latter fell and called to him, saying he was hurt and that he had lost his money; that he and Green hunted for the money without avail and Green asked him to bring Stone back or to get a light; that he went in search of Stone at the camp, but did not find him, that he spent an hour or more at the camp; that finally he started back to the place where he had left Green, and on the way back procured some matches; that, arriving at the place where Green fell, he struck several matches, and finally found Green's pocket-book at the side of the path in some rocks; that he then went back to the C. C. C. camp where he found Stone, and together they went to the Virginia Hotel; that he did not tell Stone about the money, but counted the same, which amounted to $17; that he left the hotel a few minutes after arriving there; that he met a boy named Lakeland, and they proceeded to get drunk; that he remained drunk until Sunday evening, having spent all the money except $2.65; that he intended to return the money in the first instance, but became so intoxicated he did not; that he did not assault Green and rob him; that Stone did not receive any part of Green's money; that he did not admit getting the money until the day of the trial.

A. E. Stone testified that after learning of the charge against his son, he interviewed Green in regard to the occurrence; that Green told him that the reason he had the warrant issued against Junior Stone was that he thought Junior knew who got his money; that in answer to the question: "Did he rob you?" Green replied: "No, he didn't rob me, and I don't know that he touched me, but he knows who got my money," and that he thought he would help him get the money back; that he was in destitute circumstances; that after this conversation, Green went with him (Stone) to see the attorney for the Commonwealth and requested that the warrant be withdrawn, which request was refused; that after the refusal of the attorney for the Commonwealth to dismiss the warrant, he, of his own volition, and because of the statement of Green that his son was innocent and because of the destitute circumstances of Green and his wife, he gave Green the sum of twenty-eight dollars.

It must be conceded that all conflicts in the evidence have been resolved by the verdict of the jury in favor of the Commonwealth.

The question on which rests a decision of the case is whether the evidence adduced by the Commonwealth shows beyond a reasonable doubt that the accused aided and abetted in the commission of the crime charged in the indictment, or shared in the criminal intent of the principal, if an offense was committed.

This court, in numerous decisions, has defined the status of an aider and abettor. In *Triplett* v. *Commonwealth*, 141 Va. 577, 586, 127 S. E. 486, 489, the accepted rule is stated thus: "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal or the party who commits the crime."

In *Creasy* v. *Commonwealth*, 166 Va. 721, 725, 186 S. E. 63, 64, Mr. Justice Chinn said: "The rule as to what constitutes an aider and abettor is well settled in Virginia. * * *

■ " 'In *Rasnake's Case* [*Rasnake* v. *Commonwealth*], 135 Va. 677, 710, 115 S. E. 543, Sims, P., cites with approval *Kemp's Case* [*Kemp* v. *Commonwealth*], 80 Va. 443, and *Wooden's Case* [*Wooden* v. *Commonwealth*], 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032, where it is held that the settled rule is that mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime.'

"In *Harold* v. *Commonwealth*, 147 Va. 617, 136 S. E. 658, 660, Judge Burks said: 'The mere presence of a party when a crime is committed and his consent thereto is no crime, if he was not aiding, abetting, counselling or advising its commission, and was not present for that purpose.' "

In *Whited* v. *Commonwealth*, 174 Va. 528, 6 S. E. (2d) 647, it is held that "one who aids and abets in the commission of a crime must share in the criminal intent of the actual perpetrator of the criminal act."

It is apparent from the evidence of the Commonwealth that accused did not aid, abet, counsel or advise the commission of the offense charged. The nearest approach to connecting the accused with the *corpus delicti* or with sharing in the criminal intent, is the evidence of Green that when Shupe struck him on the hand and he dropped his pocket book, that, as Shupe picked up the pocket book, the accused "looked back" and Shupe and accused "went on".

The only scintilla of circumstantial evidence which connects the accused with the robbery is that inference which may be drawn from the fact that accused and Shupe were together before and after the alleged offense, and that they were aware of the fact that Green possessed a "roll of bills".

■ While it is true that a verdict based upon circumstantial evidence, where the evidence is conclusive, is just as binding as a verdict based upon direct proof, yet it must be conceded that a verdict based upon a mere inference that accused shared in the criminal intent of the principal, should not be permitted to stand.

There is no probative evidence that accused shared in the fruits of the crime. In fact, the undisputed evidence is to the effect that he possessed the sum of five dollars when he went to Norton; that he spent fifteen cents for whiskey; that he went to a moving picture show and ate lunch in Norton, and that he spent fifty cents for a room at the hotel and spent seventy-five cents taxi fare to Glamorgan.

It is a canon of criminal law that it is not sufficient to create a suspicion or possibility of guilt, but the evidence must go further and exclude every reasonable hypothesis except that the accused is guilty of the offense charged in the indictment.

It is the contention of the attorney-general that the instant case is controlled by the holding of this court in *Creasy* v. *Commonwealth,* 166 Va. 721, 186 S. E. 63.

In our opinion the contention is untenable. There is no parallel between the facts in that case and the case at bar. In the former, Creasy was jointly indicted with one Solomon on a charge of robbery from the person of one Mallan. The facts, briefly stated, draw the distinction between the two cases. In the *Creasy Case,* it appears that the principal, Solomon, was an ex-convict, which fact was known to Creasy; that at the time of the commission of the offense, he (Solomon) was under conviction for cutting a man's throat, which fact was also known to Creasy; Solomon, at the time of the robbery, was armed with a sawed-off shotgun; that Solomon, Creasy and two other persons were drinking whiskey together before the robbery; that Creasy was present at the moment when Solomon ordered Mallan, who was seated in a car parked on 12th street in the city of Lynchburg, to "move over"; that at the command of Solomon, Creasy entered the car, saw Solomon take a dollar and a half from the pocket of Mallan, drove around awhile in the car after the robbery, and participated in the fruits of the crime by taking a drink of the whiskey afterwards purchased by Solomon.

Upon these facts, it was held that whether or not Creasy shared in the criminal intent of Solomon when he took the

money from Mallan was a question for the jury and not for the court.

The following language employed by Prentis, J., in *Lindsay* v. *Commonwealth,* 135 Va. 580, 115 S. E. 516, applies to the instant case: "We are always most reluctant to disturb a verdict which has been approved by the trial court, but giving all of the evidence in this record our most careful consideration, we are driven to the conclusion that unless the rule which requires the Commonwealth to prove crime to the exclusion of every reasonable doubt is to be abrogated, this judgment must be reversed."

Our conclusion, therefore, is to reverse the judgment and remand the case for a new trial, if the Commonwealth shall be so advised.

*Reversed.*