# CHARLESTON.

STATE *v.* BOWYER.

Submitted January 19, 1897—Decided March 24, 1897.

CRIMINAL LAW—*Appeal—New Trial—Verdict.*
　　Case in which new trial denied. Force of verdict discussed. (p. 182.)

Error to Circuit Court, Mason county.
Bowyer was convicted of burglary and brings error.

*Affirmed.*

C. E. HOGG and J. B. MENAGER for plaintiff in error.

T. S. RILEY, ATTORNEY GENERAL, for the state.

BRANNON, JUDGE:

Nibert, Dewitt, and Bowyer were sentenced to the penitentiary for burglary, and Bowyer took this writ of error. The sole question presented to us is whether the court ought to have set aside the verdict, as not warranted by the evidence. Three men broke and entered the dwelling house of James Dewitt, a little after dark, and, forcing him to show where he had his money, took from his trunk two hundred dollars. James Dewitt and his sister, the only persons at the house, identified Nibert and Dewitt, but did not recognize the third man. They say he was to them a stranger. Bowyer was from Ohio recently before, while Nibert and Dewitt lived in the neighborhood. Bowyer was at Nibert's house all that night. All three were there together. That is unquestioned. A very short time before the act, Bowyer stated to one Gardiner that he had spent what money he had, and wanted to borrow two dollars and pawn his coat for it. A witness stated that, a couple of days afterwards, Bowyer showed her a twenty-dollar gold piece, two two-dollar bills, and a ten-dollar bill. A twenty-dollar gold piece was among the money taken from Dewitt by the burglars. Bowyer admits showing the gold piece, but equivocates as to the other money. When asked if he showed the money, instead of

answering, he says, "I was with Al Nibert and Wils Dewitt all the time during the night of the robbery. We were together all night, at Al Nibert's. I don't recollect that I had but a twenty-dollar piece." He did not live with Nibert. A short time after the burglary, Bowyer borrowed a gun, and deposited ten dollars as security for its return. Where did he get this money? He said he had been working in Ohio, but for whom he does not say. He says he had some of Mrs. Dewitt's money, but she is not produced. His brother says he worked in Ohio before coming to this state, but does not say for whom, or how he knew he had money. On the Sunday of the offense, as a witness stated, Bowyer had a long beard, and went to Gallipolis on Monday, and on Tuesday this witness says he was clean shaven. Bowyer was asked by his counsel if he had a beard on at the time of the offense, and he answered equivocally, "I was clean shaved, I think," and, being asked when he shaved, said, "It might have been a week or so; I don't remember just exactly." Being asked if he had a beard an inch long on the next day after the robbery, he said, "No, sir, not that long; I am satisfied it was not that long." He denied being shaven on Tuesday, saying he shaved the last of the week, thus denying the statement of his relative, Lillie Leach, who stayed at the same house with him. A hat was dropped by Nibert on the occasion of the robbery in the yard. Bowyer offered a witness a quarter to go to the house of James Dewitt, and get it; told him just to go right in, and get it, and come right out.

This evidence was before the jury, tending to connect him with the act. By no means can it be said that the case was without some evidence to inculpate Bowyer. It is not worth while to cite authority for the proposition that, where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight, and of the proper inferences from the facts proven. But this was not all the evidence. The witnesses were face to face before the judge and jury. The prisoner was before them. They saw him in the ordeal of examination. They scrutized his countenance, his demeanor, his words, his tone. They were to judge of his veracity. They discredited his denial of guilt. They saw and heard all the witnesses, all the circumstances of the trial,—often silent,

but potential, evidence of the real truth. That judge and those jurors would average with us, had we been present, in capacity to judge of evidence; and as we have nothing of the actual appearance of the trial, and only the evidence in cold type, they are vastly more competent than we to pass safe judgment upon the facts. We are not a jury. We have power—mere power—to discredit verdicts; but we must be cautious in so doing.

Why have juries, if appellate judges are to go into the business of weighing evidence as if by the ounce and pound? We ought not to do this. It is an abuse of power, and a misconception of our functions and of the jury function. The jury institution is sacred under our Constitution, and a verdict is to be highly respected. In long experience, I must say that, as a general thing, they evince good sense and do justice. From the frequency of requests to us to set aside verdicts, it seems to be thought that we can and will do so merely because we would not have found, judging from type, the same verdict; but such is not the rule, though instances deviating from these principles may be found, and I am very much averse to looseness in this matter on the part of appellate courts. And then, too, we must not forget that a learned and experienced judge approved the verdict, after witnessing the trial; and his opinion is entitled to great respect in an appellate court. *State* v. *Hunter*, 37 W. Va. 744, (17 S. E. 307). We must be careful lest we set ourselves up as judge and jury present at the trial, and usurp their functions. We must affirm the judgment. *Gilmer* v. *Sydenstricker*, 42 W. Va. 57 (24 S. E. 566.)

*Affirmed.*