Statement.

## Wytheville

### JOSEPH WILLIAMS V. COMMONWEALTH.

June 16, 1921.

HOMICIDE—*Corpus Delicti—Where Death May Have Resulted From Act of Accused or Other Causes.*—In the instant case, the evidence before the jury, when regarded most favorably for the Commonwealth, left it, to say the least, equally probable that the death of the deceased was due to the natural cause of indigestion, as the result of overeating (to mention only one of the causes pointed to by the evidence for which the accused was not responsible), as that the death was due to any cause for which the accused could be said to be responsible. So that there was no evidence tending to exclude the hypothesis *th the death of the deceased was due to such natural cause alone. Such hypothesis is based on the evidence; is a rational hypothesis when considered in connection with the evidence; and is consistent with all of the evidence in the case.

*Held/* That there was no evidence in the case to support the verdict in the finding that the *corpus delicti* was proven.

Error to a judgment of the Hustings Court of the City of Richmond.

*Reversed.*

In this case the accused was indicted for the murder of his wife. There was a trial by jury, which resulted in a verdict finding the accused guilty of voluntary manslaughter and fixing his punishment at five years in the penitentiary. This verdict the trial court refused to set aside and judgment was entered by such court accordingly.

The only evidence bearing upon the *corpus delicti* is to the following effect:

The death of the deceased wife occurred some two hours after midnight of Sunday night, September 14, 1919. The only direct evidence of any physical violence exerted by the accused against the deceased is that with reference to the occurrences on Friday night, September 12, at the home of the father of the deceased in the city of Richmond, where the deceased was on a visit at the time. The accused, at about 6:30 o'clock, on the Friday night just mentioned, upon his return to the city from an absence on business, arrived at such home, and, in consequence of something he overheard the sister of the deceased say in a talk over the 'phone, the accused, soon after his arrival, called the deceased into a back bedroom. Shortly thereafter their raised and angry voices were heard in the bath room by the sister. In a few minutes the sister heard them come into the bedroom aforesaid, and one of them tried twice to get out of the room. The sister heard the deceased say twice, "Joe," (who is the accused) "open the door and let me out." The sister "heard a hard fall on the bed," as she testified at the trial, but admitted that in the police court she testified that she heard some one "either sit or fall" on the bed. The sister then went to the door and pushed it and some one was standing against it. She thereupon said: "Joe, open that door," and pushed the door open and saw the accused standing opposite the door and the deceased "behind the door where the bed was." The deceased thereupon commenced to speak to the sister, who is named Viola, and got so far as to say, "Viola I, ——" when the accused "grabbed her" (the deceased) "by the side of the face and pushed her down in the chair and said to shut her mouth, and used profane language." This assault was in the presence also of the mother of the deceased, who came into the room as it occurred. The deceased and the accused were in the bedroom and bathroom alone with each other only about five or six minutes. When the mother saw the assault just

mentioned, she threatened to have the accused arrested. Thereupon the accused said: "I didn't hit her." The deceased said, " 'Yes, you did . . . Joe, you did hit me,' and put her hand up behind her ear," (saying), " 'my neck hurts me now where you hit me' * * and she placed her right hand here (indicating) * * on the left side of the neck behind the ear."

Soon after the occurrences just mentioned the father of the deceased came into the house. Upon the refusal of the accused to tell what the trouble was between him and the deceased, a fight ensued between the father and the accused, in the presence of the deceased, who, while the fight was going on, begged and beseeched the accused not to hit her father because of his age and condition. Meanwhile the mother or sister had called the police over the 'phone. The fight does not seem to have resulted in any serious consequence to the combatants, and when it was over the accused begged the father "not to let the police come to the house and get him," and the father "told the police over the 'phone he had settled the quarrel, that it was only a son-in-law quarrel."

Later, the same night, the accused and the deceased went to their home in the same city.

On the following Sunday about six o'clock in the afternoon, the accused took the deceased and his child out to supper, and then for an automobile ride for an hour, returning home about seven o'clock, when the deceased complained of feeling badly. At the supper just mentioned the deceased ate a large steak with onions, hashed brown potatoes and drank coffee; still complained of being hungry, and then ordered and ate cheese, eggs and hashed brown potatoes and drank another cup of coffee.

About eight o'clock on Sunday night, after the deceased had returned home from the automobile ride aforesaid, following the meal she had eaten aforesaid, the deceased called

and had a talk with her sister, Viola, over the 'phone. In this conversation the voice of the deceased was unnatural, and she "laughed and giggled," as the sister had never heard her talk before, and the sister asked her: "What is the matter?" and the deceased said: "About three o'clock in the evening" (meaning that Sunday evening) "I was sitting on the porch and fell off the chair."

The deceased then went to bed, about eight o'clock of the night just mentioned, waked about 12:45 o'clock that night vomiting, talking wildly and incoherently. A physician was called by the accused who gave the deceased a thorough examination, expressed the opinion that she was not dangerously ill, so far as he could tell, gave her a dose of medicine, and, after staying a while, went away. The mother of the deceased, having been called over the 'phone by the accused, was also present at this time, as well as the accused. The accused and the mother sat talking for about thirty minutes after the physician left, when they noticed that the deceased was very quiet. The accused then went to the bed and found that the deceased was dead.

The medical testimony is to the effect that the death of the deceased was due to the out-pouring of blood on the brain resulting from the breaking of a blood vessel or vessels. There was no bruise or outward physical evidence of any blow on the head or anywhere on the body of the deceased at the time of her death or following any of the occurrences above narrated. And the medical testimony and the other testimony in the case is to the effect that it is equally probable that the breaking of the blood vessel or vessels may have been caused by (a) a blow on the head by the accused on Friday night, September 12; or (b) by a blow on the head occasioned by the fall of the deceased from her chair on Sunday afternoon, September 14; or (c) by the excitement of the deceased attending the occur-

rences on the Friday night above mentioned; or (d) by indigestion caused by the excessive eating aforesaid by the deceased at supper on the Sunday night aforesaid.

*L. O. Wendenburg,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

There are a number of assignments of error by the accused, but in the view we take of the evidence upon the subject of the *corpus delicti,* we find it necessary to consider but one question raised by such assignments, namely:

1. Was there sufficient evidence before the jury to support the verdict in its finding, in effect, that the *corpus delicti* was proved?

This question must be answered in the negative.

It is true, as said in *State* v. *Bowyer,* 43 W. Va. 180, at p. 181, 27 S. E. 301: "Where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight and of the proper inferences from the facts proven." See to the same effect *State* v. *Sullivan,* 55 W. Va. 597, 599, 47 S. E. 267. But in the case before us the evidence before the jury, when regarded most favorably for the Commonwealth, left it, to say the least, equally probable that the death of the deceased was due to the natural cause of indigestion, as the result of overeating (to mention only one of the causes pointed to by the evidence for which the accused was not responsible), as that the death was due to any cause for which the accused could be said to be responsible. So that there is no evidence tending to exclude the hypothesis that the death of the de-

ceased was due to such natural cause alone. Such hypothesis is based on the evivdence; is a rational hypothesis when considered in connection with the evidence; and is consistent with all of the evidence in the case. We, therefore, under the well settled rules of criminal law, cannot escape the conclusion that there is no evidence in the case to support the verdict in the finding that the *corpus delicti* was proven.

The case will, therefore, be reversed, and a new trial awarded.

*Reversed.*