# Richmond

## GRACE M. SMITH v. COMMONWEALTH OF VIRGINIA.

November 25, 1946.

Record No. 3110.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*T. W. Messick, Russell M. Weaver* and *D. Wampler Earman*, for the plaintiff in error.

*Abram P. Staples, Attorney General, M. Ray Doubles* and *Walter E. Rogers, Assistant Attorneys General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Grace M. Smith and Ralph H. Garner were jointly indicted at the February term, 1945, for the murder of Frank C. Smith, who was the husband of Grace M. Smith. On motion of her counsel, there was a severance and she was tried first. Upon her plea of not guilty she was tried by a jury. At the conclusion of the trial, begun on October 15, and lasting into October 22, she was convicted of murder in the first degree and her punishment fixed at twenty years in the penitentiary. Upon this verdict she was sentenced, and to that judgment this writ of error was awarded.

The eleven assignments of error bring under review the sufficiency of the evidence, the defendant's motion for a change of venue, the admission of certain testimony, her request for permission to examine certain articles taken from her home and held by the Commonwealth's officers, the granting of certain instructions, and her absence when the court ruled on certain motions of the defendant.

At the end of the Commonwealth's evidence and at the conclusion of all the evidence, the defendant moved to strike on the ground that the evidence wholly failed to establish that Frank Smith's death was caused by criminal agency, but, to the contrary, showed that he committed suicide; and this same issue was presented by an instruction offered by the defendant and refused, and by the motion of the defendant to set aside the verdict and discharge her from custody. The adverse rulings on this issue are the subject of the first assignment of error, and this issue is the one most fully and earnestly argued in the briefs and orally.

The Commonwealth relies on circumstantial evidence and what it claims to be the necessary inferences from it to carry its burden of proving beyond a reasonable doubt that Smith's death was the result of criminal agency, and that this defendant herself killed or aided somebody else to kill him. It was not contended in the trial court that she did it alone. It was admitted there and here that she could not have done it alone, and the theory of the Commonwealth is that Ralph H. Garner killed him and that this defendant helped him do it. The defendant claimed that neither of them did it, but that Smith killed himself. Much of the evidence is not involved in substantial conflict. The main conflicts center around the presence of Garner at the scene of the tragedy, the relations between him and the defendant, his physical condition afterwards, and the statements made by him and this defendant.

Frank Smith and Grace Smith, his wife, lived in a bungalow fronting on the east side of Willow street in Harrisonburg. Willow street runs north and south and lies between Wolfe street on the north and West Market street on the south. A living room to the south and entrance hall to the north extend across the front of the house. On the south side of the building and behind the living room is a dining room behind which is a kitchen. On the north side of the building are located a west bedroom, a bath, and a rear or east bedroom. A small hallway extends from one bedroom door to the other, and a door opens from the hall into the bath. This hallway is reached only through an opening from the north wall of the dining room.

An outside rear door leads from the driveway along the southern side of the house into the kitchen. Also from the inside of the kitchen a door and steps lead down into a basement which extends under the dining and living rooms up to the front wall of the house, there being two small basement windows in this front west wall, and a small window in the south wall overlooking the driveway beside the house.

In the basement of this house at about 9:45 p. m., on the night of February 20, 1945, W. M. Norvell and Guy Rogers, of the Harrisonburg police, found the dead body of Frank C. Smith. He was dressed only in a white undershirt, a pair of shorts, and bedroom slippers. Blood from a wound on the right forehead had run down his face and off his chin leaving a stain some two inches wide all the way down the front of his undershirt and on his shorts down to the crotch. Other than this blood stain his clothing was fresh and clean, not rumpled or torn. On his legs were some flecks of blood extending five or six inches above his ankles. There was some blood on the bottom of his slippers and some spots or flecks of blood on the top of them.

The cut in his forehead from which this blood had come was crescent shaped, about three-fourths of an inch long and opening toward the front. It was in the right temple, between the eye and the hair line, was to the bone and had severed an artery. There was also an abrasion or excoriation of the skin over the left eye and down the side of the nose, and an excoriation of the skin of the chin described by the coroner as a superficial scraping of the skin, like a brush burn. There was a spot or bruise on each side of his chest about an inch or an inch and a half in diameter.

The body was seated on a small kitchen step-up stool or ladder, with the left foot flat on the floor, and the right foot with toe on the floor and heel resting upon a rung of the stool. The body was leaning forward slightly and was held on the stool by a rope around the neck, the other end of which was tied to a brace between the joists in the ceiling. The weight of the body was mostly on the stool, so the stool could not be removed until the body had been lifted off.

The rope was not about the neck in the fashion of a running or slip noose, but was tied by means of a square or double knot, the knot being at the back of the neck. The rope was not tied tightly about the neck but was sufficiently loose to permit the coroner to stick three fingers between the knot and the neck.

The neck of the deceased was not broken. There was no wound upon him that would produce death. His mouth and eyes were closed, his tongue was not sticking out, and one of the police officers said there was a peaceful expression on his face as if he were asleep. The death certificate signed by the coroner stated that the immediate cause of death was strangulation due to hanging.

There was a mark around his neck made by the rope, beginning just posterior to the left ear, thence in a straight line downward underneath his chin and across the neck and up the right side and over his right ear. After the deceased had been buried about a month his body was taken up and a post mortem performed by Dr. J. R. Cash, Professor of Pathology at the University of Virginia, who testified as a witness for the Commonwealth as to the marks then on the body, and said with reference to the marks made by the rope: "I don't see how his whole weight could ever have been on the rope and had such little damage."

The bedroom of the defendant was on the east, and the bedroom of her husband was on the west. Between the two runs the short hallway above mentioned from which a door opens into the bath on the right proceeding from the defendant's bedroom. Just outside this bedroom door is a telephone. The head of defendant's bed is opposite the door. The door opens into the room and to the right.

In the hallway were two large pools of blood, the western pool being practically in front of the bathroom door and the eastern pool nearer the defendant's door. Lying in this blood was a small claw-hammer with the head in the west pool and part of the handle in the east pool, with no blood on the top side. There were flecks of blood on the baseboard on both sides of the hall, up to about the same height as the flecks of blood on the legs of the deceased. There were several spots of blood on the outside of the transom over the defendant's door, some spots of blood across the top of the door, as if they had struck the door from an angle; a few small flecks of blood on the sheets and pillowcases on defendant's bed, and two specks

on the east wall across the head of her bed, and several drops at the foot of her bed.

There was no blood either in the living room or the dining room. In the kitchen two footprints showed, one very faintly, as if made by shoes with blood on them. These prints pointed south, which is toward the outside door and the basement door, appeared to have been made by a shoe with pointed toe and fitted the bedroom slippers of the defendant.

Into the bathroom for a distance of 29 inches there were drops of blood on the floor which formed a design like the figure "8". On the right of the bath door is a bath tub and behind the tub two washcloth racks. There was no blood on the bath tub and no foot prints on the floor.

There were nine steps leading from the kitchen door down to the basement. There was no blood on the first three steps, but there were a few drops of blood on the next six, about in the middle of the steps. There were two drops at the foot of the stairs, none from there across the basement to the stool on which the body was, but five drops near the foot of the stool. Six feet from the stool was a bench on which was a sack of potatoes and against the bottom of the sack was a wash rag saturated with blood.

There were several footprints on the edge of the pools of blood in the hall into which the bedroom slippers of the defendant fitted and there was blood on the bottom of these slippers.

All the drops of blood appeared to be undisturbed and as they fell or struck; that is, none were smeared and there was no appearance of any object having been dragged over them or over any other place in the house. There was blood in the right hand of the deceased, but no blood on the rope around his neck. Except for the blood, the house was completely in order and there was no sign of a struggle or a disturbance. There was no blood on the defendant except on the bottom of her bedroom slippers. Before leaving the house the officers took the defendant into custody and took and retained charge of the house. Careful

investigation was made of the house and its contents, and the aid of the Federal Bureau of Investigation secured in the search for evidence.

The deceased and the defendant had been married about eighteen years and had lived in Harrisonburg all that time except for six or seven months after they were first married. He was thirty-nine years of age and she was thirty-four. He weighed about 208 pounds and she from 115 to 120 pounds. He was an automobile mechanic, and, as Dr. Cash testified, from an anatomical point of view he was perfect. For the first twelve years of their married life she was a saleswoman in a department store and for the rest of the time had done secretarial work. He joined the army January 20, 1944, and was released December 29, 1944.

On February 20, 1945, the day of his death, the deceased quit work about six p. m. and got home shortly after 6:30 p. m. The defendant left her work about her usual time, 4:30 p. m. A fellow-employee, Mrs. Marian Townes, went with her. They stopped at an A. B. C. store and each purchased a fifth of sloe gin. The deceased, the defendant, and Mrs. Townes ate dinner. The defendant had two drinks of the gin before dinner and her husband and Mrs. Townes drank the rest of the two bottles in the course of the evening, according to defendant's statement. Mr. Leach, a friend of Mrs. Townes, who had an engagement with her, came in during the meal. Shortly after seven p. m. the deceased was seen at a fire three blocks from his home. He came back and was at home when Mr. Leach and Mrs. Townes left at approximately nine p. m.

At 9:40 p. m. the defendant telephoned the police. Officers Norvell and Rogers arrived at approximately 9:45 p. m., to find Frank Smith dead and the conditions about as described. These officers called Chief of Police Keane who arrived at ten p. m., examined the body and called Dr. F. L. Byers, coroner, who got there about 10:10 p. m. The coroner examined Smith's body. As a witness for the Commonwealth he testified the body was partly suspended by

the rope. He described the character and position of the knot in the rope, the position of the body, and the cut on the temple and the abrasions as above described, and he stated that in his opinion the cause of death was strangulation, and that night he thought it was suicide; and it was his opinion that the hammer made the wound in the temple, and that he had no doubt on that point; that there was no fracture from this blow and that he did not know whether it would cause unconsciousness or not; that there was no evidence that Smith fell in the hallway; that when he examined Smith around 10:10 p. m., he had been dead forty to fifty minutes; which would place his death at 9:20 or 9:30, or he would say certainly under an hour.

Officer Norvell testified that when he and Rogers arrived at 9:45 in answer to Mrs. Smith's call, the defendant came to the door and Rogers asked, "Did you call for an officer?" and she said, "Yes". He said "What is the trouble?" She said "I don't know." Norvell said, "You will have to tell us what is wrong; we don't know what to do unless you tell us something." She said, "Come in," and turned and went through the living room and dining room to the door into the hallway that goes straight into the bathroom. She closed the door into her husband's bedroom and stepped back in front of the bathroom and pointed down at this blood. Rogers said, "What happened, who cut himself?" She said, "I don't know; I don't know." He said, "Where did the blood come from?" She said "My husband," and that she had asked him if he wanted her to call for help and he had said it did not make a damn to him whether she did or not. Rogers said, "Where is your husband now?" She said, "Go to the basement." Norvell took hold of the knob and opened the door leading to the attic. She said, "No, not that way," and she stepped around through this kitchen and opened the basement door. The lights in the basement were on.

A little while later, after Dr. Byers had made his examination, he also talked to the defendant and asked her what happened. She replied that she did not know; that she had

gone to bed. He told her that her husband was dead and she said, "Well, that can't be." She asked how long it had been and he replied forty or fifty minutes, and she repeated, "Well, that can't be." He said "I am only going by your time," and she answered "Are you trying to get sarcastic with me?" He replied that he was not, just trying to ask some intelligent questions, and she replied, "Well, I am trying to answer them, too; you talk like you think I did it." He asked her how she knew where the body was. She said she didn't know; that she had got up from the bed and gone to the bathroom and stepped in the blood; that she had not been in the kitchen and did not hear any noise; that her husband had threatened suicide previously, that she had destroyed a rope he had there because he had threatened suicide, and she just imagined that was what had happened.

Later the same night at police headquarters she told Chief of Police Keane that after Mrs. Townes and Mr. Leach left about 8:45 or 9:00 p. m., she went to her bedroom and was preparing for bed; that her husband came in and sat on the edge of the bed; she told him to go on to bed, and he got up and walked out of the room and that was the last time she saw him; that a short time afterwards she went to the bathroom and stepped in the blood in the hall and immediately telephoned the police; that she and her husband had no trouble and that she had not heard any noise in the hall.

Two days later, on February 22, in the jail, she told Keane that she wanted to tell the truth as to all that had taken place, and stated that she had undressed and got into bed when her husband came in and told her he did not like her company and jumped on her in the bed; that she had slapped him several times about the face, because she was afraid he would choke her as he had done on previous occasions; that her husband then got off the bed and she laid across the foot of the bed with her head on the bed and began to sob and cry; that she heard him walk into the bathroom and heard the basement door open; that she then

got up to go to the bathroom, with the result set forth in her other statements.

■ This was approximately the account she gave on the trial. There is no substantial conflict in the evidence to this point. The Commonwealth's theory of murder and the defendant's theory of suicide are both based on this practically undisputed evidence from which, and the evidence that is next stated, they argue to opposite conclusions. As to the relations between the defendant and her husband, her relations with other men, particularly Garner; Garner's whereabouts at the time of Smith's death, his physical condition afterwards and the statements made by him, there is great and irreconcilable conflict. These conflicts it was the province of the jury to settle and they have done so by their verdict. Unless their verdict is without credible evidence to support it their findings should not be disturbed even though if this court had been the trier of the facts it would not have so found. There was credible evidence from which the jury had the right to believe these things to be true:

At the time the deceased joined the army in January, 1944, he and his wife had been on friendly terms with the Kniceley and McCool families, neighbors on Willow street. Thereafter these families discontinued their association with Mrs. Smith because they "did not care for the way she was carrying on;" automobiles going in there at night, no lights on in the house; seeing men go in the back door; did not like the company Mrs. Smith was keeping. Mrs. Garber, her next-door neighbor, also testified she had seen men going there after Smith went to the army.

A sister of the deceased testified that after Smith came back from the army his wife didn't seem to want him around; that she was discourteous to him, danced with other boys but not with him, and that he began to look old and distressed; and that after her husband's death the defendant said she had begged for a divorce but he wouldn't give it to her, and had dared her to leave him.

Ralph H. Garner, who was jointly indicted with this defendant, was at the time of the trial forty-nine years old, six feet five inches tall, and weighed normally 260 to 265 pounds. He had lived in Harrisonburg since April, 1944. At the time of Smith's death he lived about one and one-half miles from the Smith home. He testified he did not know Frank Smith and wouldn't know him if he had met him on the street; that he had known Mrs. Smith since about the first month he was in town, but that he had no sort of love affair with her and was never in her home but one time in his life and that was when he took some sandwiches there in June, 1944, which had been ordered by Mrs. Townes. Mrs. Smith testified that was the only time he was ever there.

The restaurant where he worked was in the same building as the office in which the defendant worked. Commonwealth's witness, Mrs. McCool, testified she saw him at the Smith home twice; Mrs. Kniceley that she saw him there after Smith got back from the army; Mrs. David Rhodes testified that she saw him in Smith's car with Mrs. Smith one afternoon on Willow street and that in the summer while Smith was in the service she saw him in the Smith backyard in bathing trunks. Janie Williams, a Negro fortune teller, identified Mrs. Smith in the court room and Garner by his picture as the couple who had come to her house in Staunton some time after February 3, 1945.

The same Mrs. David Rhodes, who lives three houses down the street from the Smith home, testified that a few minutes after nine o'clock on the night of February 20, she, with her husband and three children, were in their car coming home; that they came off Wolfe street and down Willow street by the Smith home; that a car was leaving the Smith home as they passed; that her husband was driving and that she was in the front seat with him; that just as they were ready to turn into their driveway a car came off West Market and turned north on Willow, driving from one side to the other; that this car passed their car in front

of Mr. Paxton's; that the driver of this car was Ralph H. Garner, and that after it passed them it went into the Smith driveway, so she could see only the tail lights; that she got out of their car and then she heard a noise; she asked her husband what it was, and he said he did not know; that her husband took the children into the house and she stopped outside at the bottom of her front steps at the driveway; that she was there "a right smart while," and while there, and directly after the car went in, she heard a man's scream, and that about five minutes after the scream she heard something fall, "sounded like a door that fell real hard;" that the next thing she saw the car come out of the driveway, back out very fast, and then go south; that she was still on her steps and again recognized Garner; that he was looking back through the car as if looking at the Smith house; that it was light enough that she could see the car because there was a street light right across from her. The record states this witness was answering questions on cross-examination in loud and excited tones, and again that she was hysterical and screaming her replies.

It is strenuously argued for the defendant that it was impossible for this witness to have seen as she claims, and that her evidence is incredible and unworthy of belief, and we are asked to refer to the record on Garner's appeal for evidence of experiments conducted to establish that Mrs. Rhodes could not have seen as she claims. Our task here, however, is to determine the sufficiency of the evidence in this record which was the evidence on which Mrs. Smith was convicted, and from this record the credibility of this testimony was for the jury.

The husband of Mrs. Rhodes testified to meeting the car, that it was "crowding, right in the middle of the street." He was not asked whether he saw where it went but said he didn't see who the driver was, that "you cannot when there is a car facing the driver; it throws a light in your face and you cannot see." He testified that his wife stayed outside 25 or 30 minutes.

There was evidence for the Commonwealth that the next day, February 21, there was a bruise on Garner's left cheek which he had tried to cover up with cold cream and powder; that the ring finger on his left hand, on which he wore a large ring with stone setting, was cut and swollen; that he was nervous and preoccupied, and that when he was arrested several days later he said he had been expecting it. Garner offered evidence that he was at home all the time after seven o'clock on the night of Smith's death, which the jury obviously did not believe.

By this evidence, and other evidence lending some support, but too voluminous to add to this already long recital, the Commonwealth claims it has established the *corpus delicti*.

The defendant claims that the physical facts and the conditions in the Smith home establish beyond question that Smith committed suicide and that there was no other criminal agency. In her brief she states that Frank Smith "struck himself in the right forehead with a hammer, severed an artery, that bled profusely, stood in the small hallway of his home bleeding for approximately 10 minutes, walked into the bath room, obtained therefrom a wash cloth and placed it over the cut in his forehead, walked out of the bathroom with the wash cloth held over the cut, into the kitchen of his home, thence down the cellar steps to the basement where he hanged himself."

In support of this hypothesis her counsel argued that there were no signs of a struggle or fight in the house; that the blood spots in the hall and the blood on the front of his undershirt and shorts showed that Smith stood there 8 or 10 minutes after he struck himself with the hammer; that the pools of blood were not smeared, showing that he had not fallen and that there was no fight; that there was nothing to indicate any effort to clean up the blood or to conceal any evidence; that the blood spots in the bath room showed that he walked into the bath room just far enough to get the wash cloth; that the absence of blood spots in

the kitchen showed he held this cloth to his head as he walked through the kitchen to the basement door; that the blood spots on the steps showed there was no struggle to get Smith to the basement and that no one left the basement; that the blood on and around the stool showed that Smith was alive in the basement, as blood does not flow from a dead body; that Smith's body and underclothing showed there had been no struggle.

They further urge in support of the suicide theory two notes in the handwriting of Smith found in his room two days after his death, one in the waste basket stating: "This is what I come home to. The one I love with wet pants and I can't say a thing about it." The other note was found on his dresser, with the words: "Get out I don't care what happens."

The defendant's witness, Dr. DeJarnette, in answer to a long hypothetical question, gave it as his opinion that the deceased committed suicide, but he also said he reached that opinion without knowledge of evidence that anybody else was on the premises other than the deceased's wife; and that he also did not know certain other testimony which he said might have changed his opinion some.

It may be admitted that the Commonwealth has not by the evidence eliminated every possibility of death by suicide. That is not the measure of its burden. It must prove criminal agency as it must prove the identity of the criminal agent, beyond all reasonable doubt. This measure of proof has sometimes been stated in different language, just as the measure of the proof of a defendant's guilt has been stated in varying ways. For example, in *Cochran* v. *Commonwealth*, 122 Va. 801, 94 S. E. 329, quoted with approval in the opinion of this court by Mr. Justice Spratley in *Bowie* v. *Commonwealth*, 184 Va. 381, 35 S. E. (2d) 345, it is said:

"Direct evidence is not essential to prove the *corpus delicti* in any case. It may be proved as any other fact may be proved which is essential to establish the guilt of the ac-

cused, namely, by circumstantial evidence which produces 'the full assurance of moral certainty' on the subject. *Nicholas* v. *Commonwealth*, 91 Va. 741, at p. 750, 21 S. E. 364, at p. 367, and authorities therein cited."

In *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136, the opinion by Mr. Justice Spratley states: "The burden was on the Commonwealth to satisfy the jury beyond all reasonable doubt that the death of Mrs. Harrison was caused by the criminal agency of the defendant. * * * "

In *Williams* v. *Commonwealth*, 130 Va. 778, 107 S. E. 655, this court said: "It is true, as said in *State* v. *Bowyer*, 43 W. Va. 180, at p. 181, 27 S. E. 301: 'Where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight and of the proper inferences from the facts proven.' " Upon the evidence there the court concluded that "there is no evidence tending to exclude the hypothesis that the death of the deceased was due to such natural cause alone."

Here it is conclusively shown death was not due to natural cause; here there was evidence from which the jury could believe: That the deceased did not walk into the bath room and through the dining room and the kitchen to the place where the body was found in the basement; that if he had hanged himself there would have been blood on the rope; that the slackness of the rope around his neck and the character and position of the knot showed he did not tie the knot and did not strangle himself; that if he had leaned forward on the rope with enough force to have strangled himself he would have become unconscious at the approach of death and an inherent impulse to breathe would have asserted itself; that in the stage of convulsion which is shown to be one of the stages of death by asphyxia, the deceased would not have continued to sit on the stool; that the conduct and plans of the deceased negatived any purpose to commit suicide; that the sight of a man driving hurriedly to the house, followed shortly by a man's scream and the sound of a fall, and then the same man hurrying away as he looked back over his shoulder at the house,

coupled with the pools of blood and the blood spots as described,—these and other links in the chain of circumstances disclosed by the evidence combined to eliminate the theory of suicide and were sufficient to convince the jury beyond all reasonable doubt that the deceased was killed by other than his own hands.

■ We conclude here, as we did in *Maxwell* v. *Commonwealth*, 169 Va. 886, 193 S. E. 507, that "such being the circumstances, as disclosed by the record, it was for the jury to determine whether or not the *corpus delicti* had been established."

■ The jury determined that this death was caused by criminal agency; and there being sufficient evidence to support the verdict on this question this court should not, according to settled principles, overrule that finding and substitute its own opinion on the weight of the evidence if that should be a different opinion.

Is there also sufficient evidence to support the verdict that this defendant was the criminal agent, or one of the criminal agents? The Attorney General, in his brief, says: "The Commonwealth, as in many cases, is not able to show exactly what part the defendant, Grace M. Smith, played, but there are ample circumstances to satisfy any jury that she was present, aiding and abetting the act."

The Commonwealth's theory of what happened is thus stated: "That an assailant of sufficient strength to overcome the deceased came to the home of the deceased at approximately 9:00 p. m., driving into the side driveway, parking his car, and not leaving until 9:30 p. m.; that the deceased may or may not have been in the house at the moment but that he was bent on catching whoever was paying attention to his wife; that whether the deceased was in the house at the time or whether he came in and surprised the intruder in the bedroom of his wife, a fistic encounter took place in which the deceased was bruised in several places before being subdued about the open door to the bedroom and on the defendant's bed; that the blow on the deceased's temple knocked him unconscious (Dr. Byers was unwilling

to say that it could not have produced unconsciousness); that the deceased fell to the floor in the hallway, the blood from the wound in his head then making one of the pools of blood; that the assailant and defendant, either in the belief that he was dead or would die from the assault, and intending to make it appear that the deceased had committed suicide, picked his body up intending to carry it to the basement and string it up; that, when the deceased was picked up he was still bleeding and was either held up or replaced on the floor while the second pool of blood was formed as the parties deliberated and one of them got the wash cloth from the bathroom; that the deceased was either strangled with the piece of rope upstairs and then carried to the basement and strung up or was carried to the basement and there strangled; and that thereafter any blood tracks on the floor of the dining room and kitchen were cleaned up and any other evidence of a fight having occurred, such as furniture knocked about, were remedied."

The trouble about this hypothesis is that in its essential particulars it is either not supported by the evidence or is against the evidence, and its conclusion as to this defendant's participation is derived from speculation and not from the evidence.

It is not necessary to detail the evidence again. It is enough to say that the evidence is not sufficient to establish that there was a fight in which the deceased was subdued before the open door of the defendant's bedroom and on her bed; it is not proved that the blow on the head of the deceased knocked him unconscious. The evidence shows that the deceased did not fall to the floor in the hallway. It does not furnish ground for a valid inference that the assailant and this defendant picked up the body of deceased intending to carry it to the basement and string it up. It entirely fails to show that any blood tracks on the floor of the dining room and kitchen were cleaned up, and other evidence of a fight removed.

When the evidence in this record is carefully analyzed it shows only that the defendant was in the house when her

husband met his death, and that she either did not tell what she knew about it, or gave different accounts of what she did know about it. These different accounts involve more a withholding of information than contradictory statements of fact. None of them disclosed that she played any part in any sort of assault on her husband that caused his death. ■ ■ The mere presence at a place where a crime is committed is not enough to make one an aider and abetter. Even a willingness that it be done is not sufficient unless such willingness issues into suggestion or encouragement or help. That this defendant was in the house is admitted. That she did, said or suggested anything that contributed to the death of the deceased is not shown, nor is it a necessary inference from anything that is proved. That she saw the act done is not shown nor is it a necessary inference from anything proved that she did see it. It is only by conjecture that it may be said that she took any part. She should not stand convicted on supposition. It is important that crime be punished. It is even more important that the one punished should first be proved guilty by the evidence. In order for inferences to amount to evidence they must be inferences based on facts that are proved, and not inferences based on other inferences. These expressions by this court make entirely clear the conclusion required in this state of the record.

In *Stone* v. *Commonwealth*, 176 Va. 570, 11 S. E. (2d) 728, in the opinion by Chief Justice Campbell, it is said:

"In *Creasy* v. *Commonwealth*, 166 Va. 721, 725, 186 S. E. 63, 64, Mr. Justice Chinn said: 'The rule as to what constitutes an aider and abettor is well settled in Virginia.

" 'In *Rasnake's Case* (*Rasnake* v. *Commonwealth*), 135 Va. 677, 710, 115 S. E. 543, Sims, P., cites with approval *Kemp's Case* (*Kemp* v. *Commonwealth*), 80 Va. 443, and *Wooden's Case* (*Wooden* v. *Commonwealth*), 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032, where it is held that the settled rule is that mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime.'

"In *Harold* v. *Commonwealth*, 147 Va. 617, 136 S. E. 658, 660, Judge Burks said: 'The mere presence of a party when a crime is committed and his consent thereto is no crime, if he was not aiding, abetting, counselling or advising its commission, and was not present for that purpose.'"

In *Sutherland* v. *Commonwealth*, 171 Va. 485, 198 S. E. 452, it is said:

"It is elementary in this State except as modified by statute, that the accused, in a criminal case, is presumed to be innocent until his guilt has been proven beyond a reasonable doubt. The burden of proof of guilt is upon the Commonwealth. This burden continues throughout the trial and never shifts. The presumption of innocence is so strong that not only is the accused entitled to the benefit of it, but if the case be a doubtful one, the presumption is sufficient to turn the scale in his favor. It has been repeatedly held that it is not sufficient that the evidence creates a suspicion or probability of guilt; but it must go further and exclude every reasonable hypothesis except that of guilt. Nor, where a fact is equally susceptible of two interpretations, one of which is consistent with the interpretation of the accused, may the jury arbitrarily adopt that interpretation which incriminates him. The failure of the Commonwealth to point out, or the defendant to name the guilty party, is not allowed to prejudice the presumption of innocence in favor of the defendant. *Dixon* v. *Commonwealth*, 162 Va. 798, 173 S. E. 521; *Triplett* v. *Commonwealth*, 141 Va. 577, 127 S. E. 486; *Spratley* v. *Commonwealth*, *supra* [154 Va. 854, 152 S. E. 362]."

*Dixon* v. *Commonwealth*, 162 Va. 798, 173 S. E. 521, in which Mr. Justice Holt, now Chief Justice, said:

"We need not undertake to discuss the burden which rests upon the Commonwealth in criminal cases. The jury must be satisfied of the guilt of the accused beyond a reasonable doubt. Such a conclusion must be supported by credible evidence and cannot rest upon conjecture or suspicion. *Triplett* v. *Commonwealth*, 141 Va. 577, 127 S. E. 486.

"In *Wooden* v. *Commonwealth*, 117 Va. 930, 86 S. E. 305, 306, Ann. Cas. 1917D, 1032, Judge Cardwell held that, 'It is well settled by numerous cases that it is not sufficient to create a suspicion or probability of guilt, but the evidence must go further and exclude every reasonable hypothesis except that of guilt.' That is to say, except that of guilt of the crime charged. * * * The failure of the accused to give any reasonable explanation of his conduct will not sustain a conviction, nor is evidence of ill repute enough. They are matters which the jury may and should consider. But after all they do not shift from the Commonwealth the burden which ordinarily rests upon it. *Willson* v. *Commonwealth*, 160 Va. 913, 168 S. E. 344."

In *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376, Keith, P., speaking for the court, said:

"Now, it is true, that after the jury have rendered their verdict and a court is called upon to set it aside as being contrary to the evidence, the motion is heard, under our statute, as upon a demurrer to evidence, and it becomes the duty of the court to consider whether or not the evidence is sufficient to sustain the verdict. But the rule does not leave the jury at liberty to guess, and where a fact is equally susceptible to two interpretations, one of which is consistent with the innocence of the accused, they cannot arbitrarily adopt that interpretation which incriminates him."

It is needless to multiply authorities on this fundamental principle. The result of the evidence is that only by speculation or guess can it be said that this defendant aided or abetted in the commission of the crime and the verdict against her must be set aside.

This conclusion makes it unnecessary to discuss the remaining assignments of error except questions that might arise if another trial is had.

Instruction No. 6, for the Commonwealth, should not have been given as it now appears in the record. It is stated in the disjunctive, and is to be applied to each defendant acting alone and acting together. When applied separately to this defendant its effect is to tell the jury that

if Garner committed the offense then this defendant is guilty of murder. That is not the law, as appears above.

On defendant's motion for a change of venue, she filed 53 affidavits and the Commonwealth filed 67. They set forth the opinions and counter-opinions of the affiants. The proper action thereon was in the sound discretion of the trial court who was in an advantageous position to determine the merits of the motion. His action thereon is not to be reversed unless the record affirmatively shows an abuse of that discretion. This record does not so show. See *Maxwell* v. *Commonwealth*, 169 Va. 886, 193 S. E. 507.

It was not error to admit the testimony complained of in assignments three and four. This testimony related to the state of mind of Frank Smith and the relations between him and his wife. Similar testimony for similar purpose was developed by the defendant and she should not be heard to complain at its reception for the Commonwealth.

The failure of this record to show the presence of the defendant when the court ruled on certain motions made by her may be supplied by re-arraignment in event of another trial.

For the reasons stated the judgment of conviction is reversed and the case is remanded for a new· trial if the Commonwealth shall be so advised.

*Reversed and remanded.*