## KAUFMAN *v.* STATE

[No. 58, October Term, 1951.]

*Decided January 10, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*G. C. A. Anderson,* with whom were *Anderson & Barnes,* on the brief, for appellant.

*Robert M. Thomas,* Assistant Attorney General with whom were *Hall Hammond,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City and *J. Harold Grady,* Assistant State's Attorney, on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Saul Kaufman, of Baltimore, a dealer in dressed poultry, was charged on three indictments with having unlawfully obtained poultry and money from Julian B. Carrick, a dealer in live poultry, in violation of the Worthless Check Act. Code Supp. 1947, art. 27, sec. 152.

The first indictment charged that on December 28, 1950, appellant unlawfully obtained from Carrick 9,814 pounds of chickens and $13.36 in cash by means of a check drawn by Edward Seidman and endorsed by ap-

pellant. There was a discrepancy on the check between the figure and the amount written in words, but it was clearly understood that the check was intended to be for the sum of $2,500, because Carrick sold the chickens, which he had received from Mrs. Elizabeth Smith, of Queen Anne's County, for $2,486.64 and gave appellant $13.36 to make up the difference. It was undisputed that Carrick refused to accept a check drawn by appellant, whereupon appellant left Carrick's store on West Pratt Street to seek a loan. About a half hour later he returned with Seidman's check drawn on the Equitable Trust Company to the order of Farm Foods Corporation, of which appellant was president. The check was presented for payment on January 5, 1951, but was dishonored on account of insufficient funds. Carrick notified appellant that the check had been dishonored, but appellant failed to make it good.

The second indictment charged that on January 2, 1951, appellant unlawfully obtained $1,000 from Carrick by means of a check drawn by Fay Kaufman, appellant's wife, and endorsed by appellant. It was undisputed that appellant asked Carrick to loan him $1,000, and that Carrick refused to accept a check drawn by appellant, but accepted his wife's check. This check, dated December 6, 1950, was drawn on the Union Trust Company to the order of cash. It was presented for payment on January 5, 1951, and was dishonored on account of insufficient funds, but appellant failed to make it good.

The third indictment charged that on February 16, 1951, appellant unlawfully obtained 4,841 pounds of chickens from Carrick by means of a check for $1,500 drawn by Saul R. Lasky, a dealer on Gay Street, and endorsed by appellant. It was undisputed that Carrick agreed to sell this lot of poultry to appellant, but he again refused to accept a check drawn by appellant. Appellant made a cash deposit of $50 and then went out of the store to seek a loan. Shortly afterwards Carrick received a telephone call from Lasky, who promised that

he would loan appellant $1,500. After the telephone conversation, appellant returned with Lasky's check drawn on the Calvert Bank to the order of appellant. After endorsing the check, appellant tendered it to Carrick, and the chickens were delivered to appellant. The check was presented for payment, and was dishonored for the reason that Lasky had no account at the bank, but appellant failed to make it good.

The cases were tried by the Criminal Court of Baltimore without a jury. The Court found appellant guilty upon all three indictments and sentenced him to the Maryland House of Correction. On this appeal from the judgment of conviction, appellant contends that he had no intention to defraud Carrick. He claims that it had been his practice to give Carrick a check, and Carrick would hold it until cash was paid, and that he gave the three checks in dispute with the same understanding.

At common law it was an indictable offense from time immemorial to cheat any person of his money or chattels by using false weights or false measures. By the Statute of 33 Henry VIII, ch. 1, passed long before the American Revolution, cheating by means of false tokens was also made an indictable offense. Even after the passage of this Statute the fraud, in order to be a crime, must have been public in its nature by being calculated to deceive or injure the public in general, or by affecting the public trade or revenue or the public health, or being in fraud of public justice.

In *Commonwealth v. Warren,* 6 Mass. 72, Chief Justice Parsons said: "The object of the law is to protect persons who in their dealings use due diligence and precaution, and not persons who suffer through their own credulity, carelessness, or negligence. But as prudent persons may be overreached by means of false weights, measures, or tokens, or by a conspiracy, where two or more persons confederate to cheat, frauds effected in either of these ways are punishable by indictment."

In the course of time it was found that the law was inadequate to prevent the perpetration of many flagrant

frauds. Obtaining property by a false representation of fact was not a criminal offense at common law. It was held that a person who fraudulently obtained money or goods by means of a worthless check drawn on a bank in which he had no funds could not be prosecuted for cheating, as the check was not a false token. *Williams v. Territory*, 13 Ariz. 27, 108 P. 243, 27 L. R. A., N. S., 1032.

Since 1836 Maryland has had the statute providing that any person who shall by any false pretense obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same, shall be guilty of a misdemeanor. Laws 1835, ch. 319, Code 1939, art. 27, sec. 150.

The Maryland Worthless Check Act, which was first enacted by the Legislature in 1914, and finally re-enacted in 1941, provides that any person who, with intent to cheat and defraud another, shall obtain money, credit, goods, or anything of value by means of a check drawn upon any bank not indebted to the drawer, or where the drawer shall not have provided for the payment, and the same be not paid upon presentation, shall be deemed to have obtained such money, credit, goods or things of value by means of a false pretense. The statute expressly declares that the giving of such a check shall be *prima facie* evidence of intent to cheat or defraud; provided that if such person shall be a *bona fide* resident of the State of Maryland and shall deposit with the drawee of the check within ten days thereafter funds sufficient to meet the same, with all costs and interest which may have accrued, he shall not be prosecuted under this section. Laws 1914, ch. 281, Laws 1941, ch. 483, Code Supp. 1947, art. 27, sec. 152.

The purpose of this Act is to facilitate commerce and banking by averting the inconvenience and expense of handling worthless checks through banking channels, and the difficulty of collecting bills from those who give worthless checks, as well as to reduce the hazard of the loss of merchandise obtained by such checks. *State*

v. *Avery,* 111 Kan. 588, 207 P. 838, 23 A. L. R. 453; *State v. Nelson,* 58 S. D. 562, 237 N. W. 766, 76 A. L. R. 1226; *People v. Jacobson,* 248 Mich. 639, 227 N. W. 781.

By express terms of our statute, the existence of fraudulent intent is an essential element of the crime of obtaining money or property by false pretenses. It is because of the frequent difficulty in proving the intent to defraud that the Worthless Check Act contains the provision for the *prima facie* presumption of intent to defraud from the fact of giving a check which is dishonored. In a prosecution under this Act the defendant has the burden of proving that he had no intent to defraud. *Lyman v. State,* 136 Md. 40, 49, 109 A. 548, 9 A. L. R. 401. This presumption is rebuttable by proof of proper facts negativing a fraudulent intent. Thus it has been held that the drawer of a check may not be convicted where he shows that he had reasonable expectation that the check would be paid as a result of some arrangement or understanding with his bank. *State v. Schock,* 58 N. D. 340, 226 N. W. 525, 72 A. L. R. 888. It is also essential to a conviction of this offense that the person who received the worthless check must have relied upon the defendant's representations, and thereby was fraudulently induced to part with his money or property. *State v. Robinson,* Mo. Sup., 14 S. W. 2d 452.

Carrick, the prosecuting witness in this case, testified that appellant made his first purchase from him in 1949, and in about one year paid him several hundred thousand dollars. However, a number of his checks had been returned unpaid, and in July, 1950, when appellant was arrested for giving a bad check to another person, Carrick came to his rescue upon condition that he would give him a note for $18,500 to cover the entire amount then due. Carrick testified that he determined that he would not accept any more checks drawn by appellant. In telling about the check he received from Mrs. Smith's chickens, Carrick testified: "Mrs. Smith was there. It was her poultry. She saw me offer it to Mr. Kaulfan and told him he would have to pay cash for

it." The trial judge believed Carrick's testimony. He did not believe appellant's version.

In the case of the first check, drawn by Seidman, Carrick testified that appellant told him that Seidman had an investment of $20,000 in his company. The judge was warranted in believing that Carrick accepted the check on the faith of appellant's representations. The Worthless Check Act is applicable to an endorser of a worthless check, if he was in some way criminally connected with the scheme to defraud. *Dawson v. State,* 79 Tex. Cr. Rep. 371, 185 S. W. 875.

In the case of the second check, Carrick testified that appellant and his wife implored him for a loan of one thousand dollars. In telling of their pleas, Carrick testified: "He said he needed it to straighten out a few things, and then he would be all right, he would have plenty of money in a few days, his sister was selling a lot of property in New York, and so I gave him the thousand dollars. She called me up too and said it was all right. They said they had been carrying this check around in their pocket a good while, they didn't think they would have to use it." On the one hand, the judge had the evidence indicating that appellant had practically complete charge of his wife's bank account; on the other hand, the judge had Carrick's testimony that he accepted Mrs. Kaufman's check because he had no doubt that it was good, because he had taken other checks from her and they had been good.

In the case of the third check, appellant swore that he did not know that Lasky, the drawer, had phoned Carrick. Whether he did or not, Carrick testified that Lasky had phoned and asserted that the check was good. The judge was justified in finding that appellant was guilty of fraudulent intent, and that Carrick placed reliance upon appellant's representations.

It does seem remarkable that Carrick was willing to acccept Lasky's check on February 16, when Seidman's check and Fay Kaufman's check were dishonored on January 5. But Carrick's explanation was plausible for a

42

man who took considerable risks in a large and carelessly managed business. He gave the following explanation of why he accepted the last check: "He kept telling me his sister was going to sell his property in New York, and he was going to make them good, and that he had other money that was coming in, and if necessary he would sell the stores and turn them over to me. He told me about four different stories, but I know this man on Gay Street right near the Monument, and I thought sure it was the man that his check was going to be all right, or I would never have given him the poultry."

The verdict of the trial court must not be set aside on the evidence unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. Criminal Rules of Practice and Procedure, rule 7(c) ; *Edwards v. State,* 198 Md. 132, 151, 81 A. 2d 631, 639. We cannot say that the verdicts of the trial Court on the three indictments were clearly erroneous. The judgment of conviction must therefore be affirmed.

*Judgment affirmed, with costs.*