## FLOYD *v.* STATE
### (Two Appeals in Separate Records)
[Nos. 27-28, October Term, 1954.]

*Decided December 10, 1954.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Julius P. Robinson,* with whom were *Robert B. Watts*
and *Bernard F. Goldberg* on the brief, for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,*
with whom were *Edward D. E. Rollins, Attorney Gen-
eral,* and *Daniel M. Murray, Jr., State's Attorney for
Howard County,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Samuel David Floyd, a resident of Washington, was
indicted by the grand jury of Prince George's County
for the rape and robbery of Dorothy Mildred Jones, a
resident of Prince George's County, on July 7, 1953.
Both cases were removed to the Circuit Court for Howard
County, and the accused was tried before that Court

sitting without a jury. He was found guilty of rape and was sentenced to death. He was also found guilty of robbery and was sentenced to imprisonment in the Maryland Penitentiary for a term of ten years, the sentence to be suspended on condition that the death sentence is carried out. He appealed from both convictions.

Miss Jones, age 26, was employed by National Airlines as a radio operator at the Washington National Airport. She resided with her sister, Mrs. Virginia Seyforth, and her husband, Harry E. Seyforth, in their home at 3433 79th Avenue in the suburban development known as Forestville. She testified that on July 6, 1953, she finished her work at midnight, and left the airport at about 12:15 a.m. At 1:05 she took a bus on Pennsylvania Avenue in Washington on the way to Forestville. She got off the bus at the intersection of Marlboro Pike and Boone's Lane at about 1:30. While walking on Boone's Lane toward her home, she saw an automobile turn into Marion Street. As she approached the intersection of Boone's Lane and Marion Street, a Negro grabbed her with one hand and held a knife in the other. She screamed with fright, but he choked her and threatened to cut her throat if she screamed again. She asked if he wanted money. The Negro replied: "No! I'll get that later." He then dragged her across the road and pushed her down on some honeysuckle vines and raped her.

Miss Jones further testified as follows about her horrible experience: "So after he finished, then he sat up beside of me, and he said, 'How much money you got?' And I said, 'I don't know. I have twenty and a five and some ones.' And he said, 'Where's your pocketbook?' And I said, 'I think it's up there in the middle of the road.' So he went up to hunt it, and then he came back, and he said, 'It's not up there.' Then I noticed a few feet in front of me that it was lying over there, and he said 'Get it.' So I got it and gave him the money. And then he said, 'Is that all you got?' So I opened my wallet and let him see that that was all the money I had. So then he said, 'Don't you leave from here until I'm ready for

you to go, because if you do I'll shoot your head off.' He said, 'If you don't believe me, do you want to see my gun?' I saw the butt end of the gun. I couldn't stand to see it any more. And I said, 'I believe you.' Because I thought he was going to shoot me then. So I said, 'How am I supposed to know when you're ready for me to go?" And he said, 'I'll whistle.' So then he walked away, and I sat there a few minutes. I was so weak I couldn't sit up for a while. And then I heard somebody starting away in a car, * * * and then when he started up the pike I sat up and took my shoes off and ran home."

Mrs. Seyforth testified that shortly after 1:30 a.m. she heard a scream, and about five or ten minutes later she heard a car speeding down the road, and several minutes afterwards she heard her sister sobbing and knocking at the bedroom window. When she opened the door her sister collapsed in her arms. "Her skirt and her blouse was all wet and muddy," Mrs. Seyforth said, "and she had her shoes in her hand when I opened the door, and they were all caked with mud, and her hair was all messed up * * * and she was hysterical."

Mr. Seyforth called the Prince George's County police. Officers Taylor and Simmons received the call at 1:52 and arrived at 1:55. Miss Jones described the criminal as a tall Negro, with a mustache and short hair and wearing a white T-shirt. The officers immediately took her to the scene of the crime. There they found some articles from her pocketbook lying on the road.

Appellant was apprehended slightly more than one day after the crime. On July 8 at about 3 a.m. Officers Crook and Woodward, of the Metropolitan Police Department, while riding in their scout car in Washington, observed a dark green Hudson sedan that "answered the description of the information received on the Prince George's rape and robbery." The officers ordered the driver, a Negro, to stop, and requested him to show his registration card and operator's license. They immediately observed that the Negro, who was wearing army pants with large pockets, "fitted the general description

of the colored man in the case." The officers took him to the police station, where Officer Johnson promptly formed a lineup of five Negroes, all of about the same build and complexion. Two of them had a mustache. When Miss Jones appeared she instantly identified appellant as the man who had raped and robbed her. "Yes, there he is," she exclaimed, "I can feel that mustache on my mouth now."

The main contention of appellant on these appeals is that the evidence produced by the State was insufficient to warrant his convictions. He argues at the outset that since there was no moonlight early on the morning of July 7, 1953, and no electric light near the place where the rape was committed, and since the rape lasted only "between five and ten minutes," it was not probable that Miss Jones could identify the man who had raped her. We were not convinced by appellant's argument.

In the first place, Miss Jones, who frequently walked on Boone's Lane at night, and often used a small flashlight when she found it necessary, testified that she did not need a flashlight to discern the features of the man who raped her. Although the carnal act lasted only a short time, nevertheless the rapist stood near her and talked to her for some time afterwards, and she avowed that she could "never forget him in a thousand years." She also recognized his voice. When the accused was put in the lineup with the other Negroes in the police station in Washington, she immediately identified him beyond any doubt.

In addition to Miss Jones' positive identification, the State produced the testimony of Mr. and Mrs. Eugene O'Brien regarding the "loud screeching noise" of the automobile. The O'Briens, whose home is at 3500 Boone's Lane, about 100 feet from the place where the rape was committed, were startled by the scream. Mr. O'Brien looked out one window while Mrs. O'Brien looked out another. Mr. O'Brien testified that he saw an automobile parked in front of the house. He stated that it looked like a dark Hudson sedan. Just as he turned away from

the window, he heard the slamming of a door of the automobile. Then, when he turned on the electric light on the front porch, he saw the automobile speeding away. Mrs. O'Brien testified that a door of the car made a "loud screeching noise." About a week later, when she was shown appellant's automobile, the left front door "screeched something awful" when it was opened or closed, just like the door of the automobile she saw in front of her house.

Moreover, a number of footprints at the scene of the crime incriminated appellant. The footprints were observed by Sergeant Nalley, of the Prince George's County Police, on July 7 at about 8 a.m. Some of the footprints were evidently those of a woman, but others were larger. Sergeant Nalley mixed Plaster of Paris with water and poured the mixture into the larger tracks. He made thirteen plaster casts and took them to the laboratory of the Federal Bureau of Investigation in Washington. On the following day he took appellant's shoes to the F. B. I. Laboratory. Photographic enlargements were made of the casts and the soles of the shoes. After careful analysis and comparison, Frederick E. Webb, a Special Agent of the F. B. I., definitely determined that five of the impressions reproduced in the plaster casts were made by appellant's shoes, and three others were identically the same in size as appellant's shoes.

The fact that appellant had gonorrhea on August 17 and that Miss Jones, who had no venereal disease prior to the rape, was found to have gonorrhea on August 5, although there was not yet any appearance of the disease when she was examined on the morning of July 7, gave some substantiation to the identification of appellant.

Appellant complained because the State did not introduce the negative findings of the F. B. I. laboratory from the examinations made of his shirt and trousers and other articles. We find no merit in this complaint. It appears from the record that appellant requested and was given the right to inspect any documents obtained

by the State, including the results of any tests made on clothes belonging to him. He had ample opportunity to offer any such evidence.

Appellant set up the alibi that he was in the City of Washington, and not in Forestville, when the rape was committed. He testified that on the night of July 6 at about 11 p.m. he went to the home of his friend, Cecelia Matthews, on Third Street in Washington. He said that she was not at home at that time, and he waited for her. He said that she arrived at about 11:30, and then he took her for a ride, parked his car at midnight and had sexual intercourse with her and then brought her back to her home. He said that he talked with her for a while, and left at about 12:50, and arrived home shortly before 2. He further said that when reached home, his father, mother and sister were sitting in the yard, and he went to bed at about 3.

An alibi of an accused, proceeding as it does upon the idea that he was elsewhere at the time of the commission of the crime, does, of course, if thoroughly established, preclude the possibility of guilt. But all the evidence in a criminal case is to be considered together, and the jury are not to weigh merely the evidence relating to the alibi and determine from that alone whether they have a reasonable doubt of guilt. To warrant a conviction in a criminal case the charge must be proved beyond a reasonable doubt. *Wood v. State,* 192 Md. 643, 649, 65 A. 2d 316. If the jury, considering all the evidence, inculpatory and exculpatory, entertain a reasonable doubt of the defendant's participation in the crime, they should acquit him. Thus a defendant is entitled to acquittal if the alibi testimony, taken into consideration with all the other evidence in the case, raises a reasonable doubt of guilt. But in order to prove an alibi conclusively, the testimony must cover the whole time in which the crime by any possibility might have been committed, and it should be subjected to rigid scrutiny. *People v. Elmore,* 277 N. Y. 397, 14 N. E. 2d 451, 124 A. L. R. 465; *Commonwealth v. Crow,* 303 Pa.

91, 154 A. 283; 2 *Wharton, Criminal Evidence,* 11th Ed., sec. 903.

In the case at bar the accused was corroborated by his father, mother, sister, and girl friend. But the trial judges were not required to accept the alibi as true, and they were not convinced that it was true. In view of the positive identification of the accused in the case at bar by the prosecuting witness, the testimony that indicated that the automobile driven by the rapist was appellant's automobile, the definite testimony of the F. B. I. expert that footprints found at the scene of the crime were made by the soles of appellant's shoes, and other evidence produced by the State, the trial judges were warranted in disbelieving appellant's alibi. It may also be observed that the alibi did not exclude the possibility that appellant could have committed the rape between 12:50 and 2 a.m.

The Court of Appeals cannot reverse a judgment of conviction in a non-jury case unless it finds that the trial court's conclusion was clearly erroneous. General Rules of Practice and Procedure, part 4, rule 7(c) ; *Edwards v. State,* 198 Md. 132, 81 A. 2d 631, 26 A. L. R. 2d 874; *Kaufman v. State,* 199 Md. 35, 85 A. 2d 446; *Anello v. State,* 201 Md. 164, 93 A. 2d 71; *Willis v. State,* 205 Md. 118, 106 A. 2d 85. The function of the Court of Appeals is to determine whether there was any evidence, or proper inference from the evidence, upon which the trial court could find the defendant guilty. If the record shows such evidence or proper inference, the Court of Appeals cannot find that the decision of the trial court was clearly erroneous. *Estep v. State,* 199 Md. 308, 86 A. 2d 470.

We cannot say that the verdicts of the trial judges in these cases were clearly erroneous. The convictions must therefore be affirmed.

*Judgment in No. 27 affirmed.*

*Judgment in No. 28 affirmed.*