### SEWARD *v.* STATE
[No. 34, October Term, 1955.]

342

*Decided December 1, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Walter H. Moorman,* for appellant.

*Stedman Prescott, Jr.,* Assistant Attorney General, with whom were *C. Ferdinand Sybert,* Attorney General, *Alger Y. Barbee,* State's Attorney for Montgomery County, and *Leonard T. Kardy,* Deputy State's Attorney, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by James P. Seward, appellant, from a judgment and sentence by the trial judge, sitting without a jury, for malicious destruction of property.

The appellant was indicted, together with James L. Fieser, Jr., in two indictments. The first charged them with statutory arson on May 22, 1954. The second indictment, among other things, charged them with malicious destruction of property on the same date. The appellant was convicted on the third count of the second indictment for malicious destruction of property, the air conditioning unit tower owned by Hot Shoppe, Inc., in violation of Code, 1954 Supplement, Article 27, Section 119. From that conviction appellant appeals to this Court.

On the evening of May 21, 1954, the appellant and Roy Carroll Tuerke attended a motion picture show in Washington, D. C. They left there in an automobile driven by Tuerke and proceeded to the Hot Shoppe in Bethesda, Maryland. There, about 11 P.M. they met and talked to Henry Gibbs and James L. Fieser. After conversing for about twenty minutes, the four started in the car driven by Tuerke to Gibbs' home in Kenwood, Maryland. Tuerke testified that they did not drive all the way to Gibbs' home but parked down the street for fear that Gibbs' mother might detect his presence and require him to stay home, as the hour was late. The other boys remained in the car. Gibbs entered his home. Gibbs testified that he there procured four and one-half cans filled with black DuPont powder, and also his jacket. These were the cans in which the powder was originally purchased. He had previously inserted in the cans dynamite caps and fuses. He came out of the house with two cans in his jacket and two in his back pocket, not for the purpose of concealing them, but in order to carry them conveniently. He said he was carrying them "out to plant the bombs and get what pleasure I could out of seeing it." All four boys knew Gibbs had the cans when he returned to the car. Upon his return they discussed setting off one of the bombs at the Bethesda Hot Shoppe, but decided not to do it there as there were too many people in the vicinity. They then drove behind the Bethesda-Chevy Chase High School where "there was some talk of a fight or ruckus." This did not take place and they decided to drive "indiscriminately around."

They then proceeded to the Hot Shoppe in Silver Spring, Maryland, and drove the car first into an alley close by. All four boys got out of the automobile and walked a short distance. Gibbs removed one of the cans from his pocket and all four boys considered and discussed whether they should put it in one of the trash cans in the alley, but decided not to place it there. They all

returned to the car which was "jockeyed" into the best position "so they could leave the other way." Gibbs testified that he and Fieser either got into the car and got out again or walked two or three steps over to the water tower of the Silver Spring Hot Shoppe with a bomb in his hand in full view. This water tower was about eighteen feet high and eight feet square, made of one-eighth inch steel on a platform of cement. It was used to cool the water used in the Hot Shoppe's refrigeration. On the spur of the moment Gibbs put one of the bombs in the water tower. Gibbs and Fieser then returned to the back seat of the car and Tuerke, with appellant on the front seat, drove it about one or two hundred yards away where it was stopped for the purpose of hearing the explosion. In possibly five minutes the explosion occurred. As a result the bottom of the tower was buckled out and the screen, which kept the dust and debris out of the bottom of the tower, was blown a distance of from eighteen to twenty feet. After the explosion the four boys proceeded toward Bethesda and on the way discussed setting off another bomb. Gibbs asked Tuerke to stop the car. Gibbs took one of the bombs out of his pocket, making no effort to conceal it, and got out of the car. Fieser went with him and the bomb was placed in the mail slot of the home of Mr. William J. McCarthy in Bethesda. The boys did not wait for the bomb to go off but drove Gibbs to his home where he got out of the car. The bomb exploded. Mr. McCarthy was awakend and went into his hall which was filled with smoke. He went down to the first floor and found brown marks all over his front door which was burned and blistered. The screen door had been blown out.

On June 8, 1954, the Montgomery County police contacted the appellant and asked him to come to the Bethesda Police Station, at which place he made a statement. No objection was made that this statement was involuntary. Seward said on May 21, 1954, he, Tuerke, Fieser and Gibbs were riding in Tuerke's car. They

met at the Hot Shoppe in Bethesda and a short time thereafter went to Gibbs' home where he picked up some gunpowder. They then went to the Hot Shoppe in Silver Spring where a bomb was set off in a water tower. After that they left and returned to Bethesda where a bomb was placed in a mail slot in a house on Wessling Lane. He told the police that he knew all about the bombs, who was making them and who was setting them off, but the night of May 21st was the only time he had been with the other boys.

The Court of Appeals should not reverse a judgment of conviction in a non-jury case unless it finds that the trial court's conclusion was clearly erroneous. General Rules of Practice and Procedure, Part 4, Rule 7(c); *Edwards v. State,* 198 Md. 132, 81, A. 2d 631, 26 A. L. R. 2d 874; *Kaufman v. State,* 199 Md. 35, 85 A. 2d 446; *Anello v. State,* 201 Md. 164, 93 A. 2d 71; *Willis v. State,* 205 Md. 118, 106 A. 2d 85. This Court determines whether there was any evidence, or proper inference from the evidence, upon which the trial court could find the defendant guilty. If the record shows such evidence or proper inference, the Court of Appeals cannot find that the decision of the trial court was clearly erroneous. *Floyd v. State,* 205 Md. 573, 582, 109 A. 2d 729.

The offense for which the appellant was convicted being a misdemeanor, all accessories were charged as principals. *Roddy v. Finnegan,* 43 Md. 490, 503-504; *Watson v. State,* 208 Md. 210, 117 A. 2d 549, No. 12, This Term. It was said by Judge Delaplaine in the case of *Anello v. State, supra,* 168, where appellant was convicted of larceny of use of property: "It is clear that no one, whether principal perpetrator or aider or abettor, can violate this statute unless he possesses criminal intent. The legal definition of the word 'aider' is not different from its meaning in common parlance. It means one who assists, supports or supplements the efforts of another. The word 'abettor' means in law one who instigates, advises or encourages the commission of a crime. Thus the word 'abet' may import that one is present at

the commission of a crime without giving active assistance. *Creasy v. Commonwealth,* 166 Va. 721, 186 S. E. 63; *State v. Epps,* 213 N. C. 709, 197 S. E. 580; *State ex rel. Martin v. Tally,* 102 Ala. 25, 15 So. 722, 737; *State v. Western Union Telegraph Co.,* 13 N. J. Super. 172, 80 A. 2d 342, 355. * * * To be an aider or abettor it is not essential that there be a prearranged concert of action, although, in the absence of such action, it is essential that one should in some way advocate or encourage the commission of the crime. *McKinney v. Commonwealth,* 284 Ky. 16, 143 S. W. 2d 745." In *State v. Dammann,* 228 Wis. 147, 280 N. W. 698, the Supreme Court of Wisconsin held that the word "encourage" had no technical meaning. The cases of *United States v. Strong,* 263 F. 789, and *United States v. Ault,* 263 F. 800, adopted Webster's definition of "encourage" to mean "giving courage to; inspiring with courage, spirit, or hope."

In *Creasy v. Commonwealth, supra,* a young man, twenty-one years of age and of good reputation, but intoxicated at the time, encountered several friends and went with them while the others committed robbery. He knew of the past bad records of his associates and that they were armed. The evidence strongly indicated that the accused did not commit an overt act or that he in any way encouraged the others. The Virginia court stated that the law of that State was well settled that to constitute one as an aider or abettor, he must commit some overt act or share the intent with the principal. The court there held that while the accused had committed no overt act and did nothing in the way of aiding, abetting, counseling or advising the commission of the crime, the question of whether he shared the criminal intent was a question for the jury. The jury having so found, reversal was refused by the Supreme Court of Appeals of Virginia. See also *Hamilton v. Commonwealth,* 177 Va. 896, 15 S. E. 2d 94, decided June, 1941. In the late case of *Spradlin v. Commonwealth,* 195 Va. 523, 79 S. E. 2d 443, decided January 25, 1954, the Vir-

ginia court stated that every person who is present and who counsels or advises the commission of a crime is guilty of the offense and whether such person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence.

In *State v. Epps, supra,* 583, the Supreme Court of North Carolina held that an abettor is one who gives aid and comfort or who either commands, advises, instigates or encourages another to commit a crime or who, by being present, by words or conduct assists or incites another to commit the criminal act. In *State v. Williams,* 225 N. C. 182, 33 S. E. 2d 880, decided May, 1945, relying on *Wharton's Criminal Law,* 12th Ed., Vol. 1, Chap. 9, Sec. 246, the North Carolina Court said that when the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, the presence alone may be regarded as encouragement and in contemplation of law this amounted to aiding and abetting.

In *State ex rel. Martin v. Tally, supra,* the Supreme Court of Alabama stated that the words "aid" and "abet" comprehend all assistance rendered by acts or words of encouragement or support or presence to render assistance, if it becomes necessary. No particular acts are necessary. In *Cantrell v. State,* 29 Ala. App. 742, 199 S. 614, it was held that the words "aid" and "abet" comprehend all assistance rendered by acts or words of encouragement, or support, or presence to render assistance should it become necessary and no particular acts are essential.

In *State v. Pickel,* 116 Wash. 600, 200 P. 316, 317, the Supreme Court of Washington defined "encourage" as "to help, forward, incite, stimulate, countenance, advise." See also *State v. Allen,* 34 Mont. 403, 87 P. 177, 182. In *McKinney v. Commonwealth, supra,* it was held that to be an aider or abettor in the commission of a crime, a person must be actually or constructively present at the time of its commission and participate in some

way in the act committed. In *Tinsley v. Commonwealth*, Ky., 273 S. W. 2d 364, it was stated that persons who associate together to commit robbery and who assist or are present and ready to aid or do aid in its commission are all guilty of the crime.

For cases which hold that, where persons assemble for an illegal purpose, commission of the offense by any one party is the act of all, see *Williams v. State*, 164 Tenn. 562, 51 S. W. 2d 482; *People v. Bogue*, 319, Ill. 294, 149 N. E. 750; and *People v. De Stefano*, 332 Ill. 634, 164 N. E. 131.

Appellant relies on *Yanch v. State*, 201 Md. 296, 93 A. 2d 749. In that case Mrs. Yanch was convicted by the trial court for the possession of lottery tickets which had been found among a large pile of newspapers on a piano in a tavern. The evidence showed that she was not the licensee of the tavern, owned by her husband, or that she had any possession of or interest in it. There was no more evidence against her than against the housekeeper, who placed newspapers and magazines on the piano. There was no evidence that Mrs. Yanch had any knowledge of the lottery tickets. This Court held that there was no legally sufficient evidence to support a rational inference that the lottery tickets found on the piano were in her possession. That case is hardly helpful to the appellant here.

In *Watson v. State, supra,* there was no evidence that Polly Conway knew that the appellant intended to kill the child whom he drowned in a tub, until he got the tub of water and put the child in it. There was no evidence that she aided or abetted the crime or encouraged it. We there held that she was not an accessory. That case is not in point here.

Here, the appellant admitted to the police that he knew all about the bombs, who was making them, and who was setting them off. He also knew, when Gibbs returned to the car from his home, that he had the bombs with him. In the car all the boys discussed setting off one of the bombs at the Bethesda Hot Shoppe. Appellant

could have left them at that time and also back of the Bethesda-Chevy Chase High School. Knowing that the placing of the bombs was contemplated, he continued in the car to the Silver Spring Hot Shoppe and there got out of the car with the other boys, with the intention of placing a bomb in a trash can. He could have left the other boys at that time. Instead he returned to the car and was on the front seat when it was placed in a position for an easy exit. He was only two or three steps from Gibbs when Gibbs, with the bomb in full view, threw it in the water tower. He could have left the car then. However, he remained in the car after it stopped two hundred yards distant, in order to hear the explosion. He continued in the car with the other boys when the setting of another bomb was discussed and he remained in the car when the bomb was placed in Mr. McCarthy's door.

Under the authorities herein cited, we cannot say that the trial judge, from the evidence or from proper inference from the evidence, was clearly wrong in finding that the appellant in some way encouraged the commission of the crime. Finding no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*